Dr. Ben BRANCH, Trustee of Bank of New England Corporation, derivatively and on behalf and in the name of Maine National Bank, Plaintiff–Appellee,

v.

The UNITED STATES, Defendant–Appellant.

No. 95–5022.

United States Court of Appeals, Federal Circuit.

Nov. 13, 1995.

William F. Sheehan, Shea & Gardner, Washington, DC, argued for plaintiff-appel-lee. Of counsel was Celestine R. McConville, Shea & Gardner.

Jacob M. Lewis, Appellate Staff, Civil Division, Department of Justice, Washington, DC, argued for defendant-appellant. With him on the brief were Frank W. Hunger, Assistant Attorney General, and Mark B. Stern. Of counsel were Thomas A. Schulz, Assistant General Counsel, and Wendy B. Kloner, Counsel, Federal Deposit Insurance Corporation, Washington, DC.

Before PLAGER, CLEVENGER, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

This case presents a question of first impression for this court: whether the federal government violated the Takings Clause of the Fifth Amendment when it seized the assets of a bank to offset losses resulting from the failure of another bank owned by the same bank holding company. The Court of Federal Claims held that the seizure of the bank's assets constituted an uncompensated taking and therefore violated the Fifth Amendment. *Branch v. United States,* 31 Fed.Cl. 626 (1994).

We disagree. The statutory provision at issue in this case directs that when a bank failure causes a loss to the federal Bank Insurance Fund, sister banks that are owned by the same bank holding company may be held liable for the loss. The statute thus creates a special exception to the normal rule of limited corporate liability. We hold that the application of that statutory exception did not result in a prohibited taking of property in this case. We therefore reverse the order of the trial court. In upholding the statute as applied in this case, we join the Second Circuit, the only other court of appeals that has addressed the question of the statute's constitutionality. *See Meriden Trust & Safe Deposit Co. v. Federal Deposit Ins. Corp.,* 62 F.3d 449 (2d Cir.1995).

I

The Maine National Bank was established as a national banking organization in 1889. In 1985, it was acquired by the Bank of New England Corporation (BNEC), a bank hold-

ing company that owned several other financial institutions, including the Bank of New England and the Connecticut Bank and Trust Company. At the time it was acquired and thereafter, the Maine National Bank was considered to be in good financial health, and as of 1991 it had a net value of approximately $65 million.

In 1989, responding to a crisis in the savings and loan industry, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 (1989). The statute made extensive changes in the regulatory system for both the savings and loan and the banking industries. Several of the changes were designed to ensure the financial soundness of the Bank Insurance Fund, the fund that insures deposits in national banks. One of the innovations introduced by FIRREA was the so-called "cross-guarantee provision," which is codified at 12 U.S.C. § 1815(e). Under the cross-guarantee provision, any bank owned by a bank holding company is liable for losses to the Bank Insurance Fund caused by the failure of a sister bank owned by the same holding company. *See* 12 U.S.C. § 1815(e)(1)(A).

In the late 1980s, the Bank of New England began experiencing financial problems. Efforts to save the bank failed, and on January 6, 1991, the Comptroller of the Currency declared both the Bank of New England and BNEC insolvent and appointed the Federal Deposit Insurance Corporation (FDIC) as their receiver. On the same day, pursuant to the cross-guarantee provision of FIRREA, the FDIC served the Maine National Bank with a Notice of Assessment of Liability for the entire anticipated loss from the Bank of New England failure, a total of more than $1 billion. Although that sum was later reduced to approximately $99 million, both amounts exceeded the net value of the Maine National Bank. When the Maine National Bank advised the FDIC that it could not pay the assessment, the Comptroller of the Currency declared the Maine National Bank insolvent, closed the bank, and appointed the FDIC as its receiver. On the following day, BNEC filed for bankruptcy.

The FDIC eventually took possession of all the assets of the Maine National Bank, the Bank of New England, and the Connecticut Bank & Trust Company. Most of the assets of the insolvent banks were transferred to "bridge banks," which continued operating the banks until they could be sold. The banks were ultimately sold to Fleet/Norstar Financial Group, Inc.

Plaintiff Branch, the trustee in bankruptcy of BNEC, brought suit in the Court of Federal Claims. Branch alleged that the assessment against the Maine National Bank, followed by the seizure and closure of the bank, constituted a taking within the meaning of the Fifth Amendment, for which the Maine National Bank had to be compensated.

The government moved for summary judgment, but the Court of Federal Claims denied the motion. The court held that the application of the cross-guarantee provision of FIRREA would constitute a taking unless the Maine National Bank and BNEC had disregarded the corporate form in their dealings with one another. The government then moved, pursuant to 28 U.S.C. § 1292(d)(2), for leave to take an interlocutory appeal from the order denying summary judgment. The trial court granted permission for the interlocutory appeal, as did this court.

## II

■ Before reaching the merits, we address a question of jurisdiction. In his complaint, Branch identified himself as the trustee in bankruptcy of BNEC, which in turn was the sole owner of the Maine National Bank. As trustee of BNEC, Branch therefore now holds all the shares of the Maine National Bank. In his capacity as the holder of all the shares of the Maine National Bank, Branch brought what he termed a shareholder derivative action on behalf of and in the name of the bank.

Although the issue was not raised before the Court of Federal Claims, there is a question whether the Court of Federal Claims may entertain shareholder derivative actions. In 1982, the Court of Claims stated that shareholder derivative actions are not within the court's jurisdiction. *See Whited v. Unit-*

*ed States,* 230 Ct.Cl. 963, 965, 1982 WL 1408, *cert. denied,* 459 U.S. 871, 103 S.Ct. 157, 74 L.Ed.2d 131 (1982). The court noted that its rules contain no counterpart to Rule 23.1 of the Federal Rules of Civil Procedure, which permits shareholder derivative actions to be brought in district courts. More recently, the Court of Federal Claims has distinguished the *Whited* case and held that the absence of a specific rule authorizing shareholder derivative actions does not jurisdictionally bar that court from entertaining claims against the United States that are brought in the form of shareholder derivative suits. *Suess v. United States,* 33 Fed.Cl. 89, 97 (1995).

This court has not had occasion to address the question whether the Court of Federal Claims has jurisdiction over shareholder derivative actions, and we do not find it necessary to resolve that question in this case. Both parties argue that jurisdiction in this case can be premised on an alternative ground, and we agree.

As trustee in bankruptcy for BNEC, Branch not only holds all the shares of the Maine National Bank, but also represents the interests of the shareholders of BNEC. A judgment favorable to the plaintiff in this case would increase the assets of BNEC and could result in a surplus that would benefit BNEC's shareholders. In a similar setting, this court held in *California Housing Securities, Inc. v. United States,* 959 F.2d 955, 957 n. 2 (Fed.Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 324, 121 L.Ed.2d 244 (1992), that it was not necessary to determine whether the owner of a savings and loan association could sue derivatively for an alleged taking of the property of the savings and loan, since the complaint could be construed "as filed by a sole shareholder on behalf of a corporation alleging that compensation to the corporation will result in a surplus in which the shareholder possesses a direct interest." The same analysis is applicable here. Because the complaint can be construed as an action by the trustee of BNEC to recover assets for that corporation, the Court of Federal Claims had jurisdiction over the action, regardless of whether the court could properly have exercised jurisdiction on a shareholder derivative theory.

### III

■ In analyzing a takings claim, a court must first determine what was taken. In his complaint and in his argument before this court, Branch characterizes the taking as consisting of the assessment and the consequent seizure and closure of the Maine National Bank. That characterization, however, is too broad, for it does not pinpoint what step in the sequence of events resulting in the closure of the Maine National Bank constituted conduct that the government could not engage in without paying compensation.

■ The seizure and closure of the bank, once the bank became insolvent, did not constitute a taking. It is well established that it is not a taking for the government to close an insolvent bank and appoint a receiver to take control of the bank's assets. *See Golden Pacific Bancorp v. United States,* 15 F.3d 1066, 1073–74 (Fed.Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 420, 130 L.Ed.2d 335 (1994); *California Housing Sec., Inc.,* 959 F.2d at 957–60. Banking is a highly regulated industry, and an individual engaged in that industry is deemed to understand that if his bank becomes insolvent or is operated in violation of laws or regulations, the federal government may "take possession of its premises and holdings," *California Housing Sec., Inc.,* 959 F.2d at 958, and no compensation for that governmental action will be due.

■ Branch acknowledges that the closing and seizure of the bank would not ordinarily be a taking, but he argues that it constituted a taking in this case because the government caused the bank's insolvency. The Maine National Bank's insolvency was the direct result of the FDIC's assessment of liability. It is therefore the assessment that must be examined to determine if it constituted a taking under governing Fifth Amendment principles.

■ To be sure, analyzing the assessment under the principles of takings law is awkward. If a particular governmental action is deemed a taking, it means that the govern-

ment may engage in the action but must pay for it. Thus, if the assessment growing out of the cross-guarantee provision was a taking of the assets of the Maine National Bank, the government has to pay for what it took. But because the property allegedly taken in this case was money, that leads to the curious conclusion that the government may take the bank's money as long as it pays the money back. At bottom, then, the takings claim raised in this case amounts to a contention that the Constitution forbids the government from enforcing the cross-guarantee provision against the Maine National Bank at all. For the reasons discussed below, we do not believe the Constitution disabled Congress from addressing a significant economic problem by extending liability for bank defaults to sister banks within the same bank holding company system, and we do not believe that remedy was unconstitutional as applied in this case.

### A

■ Branch first argues that the assessment in this case resulted in a *per se* taking, *i.e.,* one that requires compensation "without case-specific inquiry into the public interest advanced in support of the restraint." *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, ——, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992). Branch emphasizes two points: (1) that the federal government "invaded" the Maine National Bank by seizing its assets and taking control of its affairs; and (2) that the assessment did not just consume a portion of the bank's assets, but exceeded the bank's entire net worth.

As to the first factor, we have already noted that under this court's precedents the seizure and control of the bank, by itself, did not constitute a taking. The taking, if there was one, must be found in the assessment that precipitated the bank's insolvency, which in turn resulted in the seizure of the bank's assets.

■ In making his *per se* takings argument, Branch invokes the analytical framework employed in cases involving "permanent physical occupation or destruction of economically beneficial use of real property." *Concrete Pipe & Prods., Inc. v. Construction*

*Laborers Pension Trust,* —— U.S. ——, ——, 113 S.Ct. 2264, 2290, 124 L.Ed.2d 539 (1993). In particular, he relies on the Supreme Court's decisions in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), and *United States v. Pewee Coal Co.,* 341 U.S. 114, 71 S.Ct. 670, 95 L.Ed. 809 (1951). Those cases, however, are inapposite. In *Loretto* the State of New York authorized a physical invasion and permanent occupation of Loretto's property, and in *Pewee Coal* the federal government took possession of and operated Pewee's coal mines—both paradigmatic takings. In this case, by contrast, the challenged assessment did not constitute either an invasion or a restriction on the use of real property.

If the State of New York had seized Loretto's property after she failed to pay a tax liability, or if the federal government had seized the assets of the Pewee Coal Company after the company failed to pay a large civil penalty, the seizure of the property would not be a taking. In such cases, the tax assessment or civil penalty might be challenged on Takings Clause or other constitutional grounds, but if those assessments survived constitutional scrutiny, the consequent enforcement action, including seizure of the property, could not be challenged as a taking. *See United States v. Garcia,* 474 F.2d 1202, 1205 (5th Cir.1973). The physical seizure of the Maine National Bank therefore does not buttress Branch's argument; in order to prevail on his *per se* takings claim, he must establish that the cross-guarantee assessment itself constituted a *per se* taking.

■ Because of "the State's traditionally high degree of control of commercial dealings," *Lucas,* 505 U.S. at ——, 112 S.Ct. at 2899, the principles of takings law that apply to real property do not apply in the same manner to statutes imposing monetary liability. Thus, even though taxes or special municipal assessments indisputably "take" money from individuals or businesses, assessments of that kind are not treated as *per se* takings under the Fifth Amendment. *See Houck v. Little River Drainage Dist.,* 239 U.S. 254, 264–65, 36 S.Ct. 58, 62, 60 L.Ed.

266 (1915) (special assessment is not unlawful under the Takings Clause "unless the exaction is a flagrant abuse, and by reason of its arbitrary character is mere confiscation of particular property"); *Cole v. LaGrange,* 113 U.S. 1, 8, 5 S.Ct. 416, 419, 28 L.Ed. 896 (1885) ("the taking of property by taxation requires no other compensation than the taxpayer receives in being protected by the government to the support of which he contributes"); *County of Mobile v. Kimball,* 102 U.S. 691, 703, 26 L.Ed. 238 (1880) ("neither is taxation for a public purpose, however great, the taking of private property for public use, in the sense of the Constitution").

 Nor are other, less conventional assessments viewed as *per se* takings, requiring compensation without any inquiry into their reasonableness. For example, the Supreme Court has upheld a congressionally mandated deduction from the sums awarded by a claims tribunal, holding that such a deduction cannot be characterized as a physical appropriation of property and therefore does not constitute a *per se* taking. *See United States v. Sperry Corp.,* 493 U.S. 52, 62 n. 9, 110 S.Ct. 387, 395 n. 9, 107 L.Ed.2d 290 (1989); *see also Meriden Trust & Safe Deposit Co.,* 62 F.3d at 455 n. 2 (*per se* takings analysis is inapplicable to congressional imposition of monetary liability); *Atlas Corp. v. United States,* 895 F.2d 745, 756 (Fed.Cir.1990) ("Requiring money to be spent is not a taking of property."); *cf. Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 163, 101 S.Ct. 446, 452, 66 L.Ed.2d 358 (1980) (state appropriation of the interest on a fund deposited into court held to be a taking only after Court concluded that there was not "any reasonable basis to sustain the taking of the interest").

 Branch's second ground for asserting that this case presents a *per se* taking is that the property that was taken was taken in its entirety. Because the assessment exceeded the net value of the Maine National Bank, Branch characterizes the assessment as analogous to a governmental regulation that denies all economically beneficial or productive use of land. *See Lucas,* 505 U.S. at ——, 112 S.Ct. at 2893. If the assessment had been smaller than the net worth of the

bank, the court under Branch's theory would presumably analyze the assessment under the quite different principles applicable to regulatory takings.

The constitutionality of the assessment should not depend on the happenstance of the financial condition of the assessed bank at the time of the assessment. We are unaware of any principle of takings law under which an imposition of liability is deemed a *per se* taking as to any party that cannot pay it. It would be perverse to hold that a statute resulting in a $99 million liability would be constitutional as applied to any member of the BNEC system having a net worth of more than $100 million but unconstitutional *per se* as to any member having a net worth of less than $100 million. The assessment in both cases is based on the same theory of liability and should meet the same constitutional fate. Thus, the fact that the FDIC assessment was greater than the net worth of the Maine National Bank does not justify treating the assessment as a *per se* taking of property akin to an appropriation of land.

**B**

 As a backup to his *per se* taking argument, Branch contends that the government's conduct resulted in a taking under the "regulatory taking" doctrine, which requires a case-specific inquiry into the nature and justification of the governmental action. The assessment at issue in this case was the product of a change in the principles of liability applicable to bank holding companies and their subsidiaries. Branch's argument therefore presents the question whether that change in the law went "too far," *see Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922), and therefore resulted in a regulatory taking for which the government must pay compensation.

 As a general matter, a legislature is free to make statutory changes in the common law rules of liability without running afoul of the Fifth or Fourteenth Amendment protections of property. The reason, the Supreme Court has explained, is that no one is

considered to have a property interest in a rule of law. More than a century ago, the Court made that point in a case involving a challenge to a state statute fixing a maximum amount that could be charged for the storage of grain in warehouses. In rejecting the several constitutional challenges to the statute, the Court wrote:

A person has no property, no vested interest, in any rule of the common law. That is only one of the forms of municipal law, and is no more sacred than any other. Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the legislature, unless prevented by constitutional limitations.

*Munn v. Illinois,* 94 U.S. 113, 134, 24 L.Ed. 77 (1876). Applying the same principle, the Supreme Court later rejected a constitutional challenge to a workmens' compensation law that abrogated various common law defenses previously available to employers. Again, the Court emphasized that "no person has a vested interest in any rule of law entitling him to insist that it shall remain unchanged for his benefit." *New York Central R.R. v. White,* 243 U.S. 188, 198, 37 S.Ct. 247, 250, 61 L.Ed. 667 (1917). More recently, this court has applied those principles in rejecting a Takings Clause challenge to a statutory change in the rules governing the disposition of military pension funds following a divorce. *Fern v. United States,* 908 F.2d 955, 959 (Fed.Cir.1990).

To treat every statutory change in the rules of liability as a taking would cripple the ability of federal and state legislatures to adjust the benefits and burdens of economic life. In the words of Professor Fuller, cited approvingly by the Supreme Court, "If every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever." Lon Fuller, *The Morality of Law* 60 (1964), quoted in *Landgraf v. USI Film Prods.,* —— U.S. ——, —— n. 24, 114 S.Ct. 1483, 1499 n. 24, 128 L.Ed.2d 229 (1994). Accordingly, when addressing constitutional challenges to new

rules of liability, the Supreme Court has regarded the Takings Clause as a first cousin of the doctrine of substantive due process and has given broad scope to legislative prerogatives to modify legal rules without having to compensate affected parties for the costs resulting from the changes. In two recent cases closely analogous to this one, the Court has made that point explicitly, observing that it would be "surprising indeed to discover" that a statute that satisfied the Due Process Clause nonetheless violated the Takings Clause. *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 223, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986); *Concrete Pipe,* —— U.S. at ——, 113 S.Ct. at 2289.

In *Connolly* and *Concrete Pipe,* the Supreme Court upheld against both Due Process and Takings Clause claims the statutory changes in pension law that resulted in the imposition of liability on companies withdrawing from multiemployer pension plans. The Court in *Connolly* began its takings analysis by noting that a statute establishing a new form of liability is a kind of regulatory statute that does not necessarily effect a taking. The Court wrote:

In the course of regulating commercial and other human affairs, Congress routinely creates burdens for some that directly benefit others. For example, Congress may set minimum wages, control prices, or create causes of action that did not previously exist.... "[L]egislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations."

475 U.S. at 223, 106 S.Ct. at 1025 (quoting *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 16, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976)).

The Court acknowledged that for regulatory acts challenged on Takings Clause grounds, there is no "set formula" for identifying a taking forbidden by the Fifth Amendment. Instead, the Court explained, it had relied on "ad hoc, factual inquiries into the circumstances of each particular case." 475 U.S. at 224, 106 S.Ct. at 1026. To aid in that determination, the Court identified three factors as having "particular significance" in the takings analysis: (1) the character of the

government action; (2) the economic impact of the regulation on the claimant; and (3) the extent to which the regulation has interfered with reasonable investment-backed expectations. *Id.* at 225, 106 S.Ct. at 1026; *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984). Standing alone, those factors are so general that they provide little guidance. More instructive, however, is the manner in which the *Connolly* Court applied those factors to conclude that the statutory scheme of withdrawal liability did not violate the Takings Clause.

First, with regard to the character of the government action, the Court noted that the government had not appropriated the employer's assets for its own use. Instead, the Court characterized the interference with the employer's property rights as arising from "a public program that adjusts the benefits and burdens of economic life to promote the common good." 475 U.S. at 225, 106 S.Ct. at 1026.

Second, with regard to the impact of the statute on employers, the Court acknowledged that the burden on particular employers could be heavy. It nonetheless concluded that, in the absence of a showing "that the withdrawal liability actually imposed on an employer will always be out of proportion to its experience with the plan," the imposition of liability is not a taking, but is only "a necessary consequence of the [statute's] regulatory scheme." 475 U.S. at 226, 106 S.Ct. at 1027.

Third, with regard to whether the withdrawal liability provisions interfered with reasonable investment-backed expectations, the Court found that in light of the history of federal pension regulation, employers could not reasonably assume that their obligations to pension funds would never exceed the specific terms of their contracts. As the Court explained, "[t]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Connolly*, 475 U.S. at 227, 106 S.Ct. at 1027 (quoting *FHA v. The Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132

(1958)). *See also Concrete Pipe*, —— U.S. at —— – ——, 113 S.Ct. at 2291–92.

When applied to this case, the three elements of takings analysis employed in *Connolly* and *Concrete Pipe* dictate the same conclusion: that Congress's statutory extension of liability did not result in a violation of the Takings Clause. First, with regard to the character of the government action, the cross-guarantee provision, like the statutes at issue in *Connolly* and *Concrete Pipe*, does not authorize a type of physical invasion. Moreover, although the government is the immediate recipient of the "sister bank" assets transferred under FIRREA, the purpose of the cross-guarantee provision is similar to the purpose of the withdrawal liability provision in the multiemployer pension plan statute.

Congress's purpose in imposing hefty withdrawal liability on employers was to ensure that multiemployer pension plans would be adequately funded and that the Pension Benefit Guaranty Corporation would not be subjected to massive liability upon the termination of numerous underfunded plans. Similarly, the cross-guarantee provision of FIRREA requires banks to share liability for losses caused by sister bank failures so as to protect depositors, secure the soundness of the national banking system, and reduce the impact of bank failures on the Bank Insurance Fund. Although the immediate effect of both statutes is to minimize losses to government insurance funds, the ultimate purpose of the legislation in both cases is to protect private parties and to make the pertinent insurance system self-sufficient by increasing the burden on participants in the system. *See Concrete Pipe*, —— U.S. at ——, 113 S.Ct. at 2291 ("[t]hat the solvency of a pension trust may ultimately redound to the benefit of the PBGC, which was set up in part to guarantee benefits in the event of a plan failure, is merely incidental to the primary congressional objective of protecting covered employees and beneficiaries of pension trusts").

The second point made by the *Connolly* Court—that there is a rational relationship between the amount of the employer's withdrawal liability and the employer's prior ex-

perience with the plan—applies in a similar manner to the cross-guarantee provision. By imposing liability on sister banks within the same bank holding company system, Congress chose to burden related institutions for the failure of their sister banks rather than visiting those costs on unrelated banks (through increases in deposit insurance premiums) or on taxpayers in general. That is a reasonable manner in which to allocate the financial burden of bank failures, for several reasons.

First, as the Supreme Court has noted, it is rational to attempt to impose the costs inherent in a certain type of business activity on "those who have profited from the fruits" of the business in question. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 18, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976). Bank holding companies and their subsidiaries derive great benefits from the ability to conduct business in that form. *See* Robert Charles Clark, *The Regulation of Financial Holding Companies*, 92 Harv.L.Rev. 787, 816–25 (1979); Lisa Lamkin Broome, *Redistributing Bank Insolvency Risks: Challenges to Limited Liability in the Bank Holding Company Structure*, 26 U.C. Davis L.Rev. 935, 978–81 (1993). FIRREA demands that in exchange for those benefits of common ownership and operation, the subsidiaries of a holding company assume some burdens of joint operation by paying for the losses that other members of the same bank holding company system impose on the Bank Insurance Fund.

Second, a single bank holding company, unlike unrelated banks and the public at large, has some measure of control over the success or failure of the banks within its system. Giving bank holding companies added incentives to take steps to protect against failures of banks within the holding company system is a rational way of protecting the Bank Insurance Fund. Instead of adopting the cross-guarantee provision, Congress could have raised the premiums for deposit insurance on all banks. It was reasonable, however, for Congress to impose a larger share of the burden of losses to the Bank Insurance Fund on the bank holding company systems responsible for the losses, rather than taxing all banks indiscriminately.

Third, holding all related banks liable for losses caused by failing banks within the system reduces the risk that bank holding companies will favor their successful banks and allow their less successful banks to fail, a "moral hazard" that is particularly tempting if the profits of the successful banks can be safeguarded, while the losses of the failing ones are underwritten by the Bank Insurance Fund. James F. Groth, *Can Regulators Force Bank Holding Companies To Bail Out Their Failing Subsidiaries?—An Analysis of the Federal Reserve Board's Source-of-Strength Doctrine*, 86 Nw.U.L.Rev. 112, 136–39 (1991); Kieran J. Fallon, *Source of Strength or Source of Weakness?: A Critique of the "Source-of-Strength" Doctrine in Banking Reform*, 66 N.Y.U.L.Rev. 1344, 1382 (1991); Daniel R. Fischel et al., *The Regulation of Banks and Bank Holding Companies*, 73 Va.L.Rev. 301, 314–15 (1987). The cross-guarantee provision is therefore further justified as a means of removing the incentive for bank holding companies to manipulate assets among their subsidiaries in a way potentially damaging to the Bank Insurance Fund.

■ BNEC points out that the record is devoid of any indication that it behaved in the manner alluded to above. The legislative scheme is rational, however, even if it does not require proof of specific misconduct as a predicate to the application of the cross-guarantee provision. As the Supreme Court said with respect to a similar argument in *Connolly*, it was lawful for Congress to impose withdrawal liability on employers without proof that the particular employer's plan was underfunded. Concerned that unregulated withdrawals from multiemployer plans could endanger their financial vitality, "Congress imposed withdrawal liability as one part of an overall statutory scheme to safeguard the solvency of private pension plans." Congress saw "no constitutionally compelled reason to require the Treasury to assume the financial burden of attaining this goal." 475 U.S. at 227–28, 106 S.Ct. at 1027. Moreover, in order to create an effective deterrent against asset manipulation within a bank holding company system, it was rational for Congress to make the cross-guarantee provi-

sion applicable across the board, rather than to rely on the FDIC's ability to prove manipulation on a case-by-case basis after each bank failure. *See Mourning v. Family Publications Serv., Inc.,* 411 U.S. 356, 373–74, 93 S.Ct. 1652, 1662–63, 36 L.Ed.2d 318 (1973); *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 388–89, 47 S.Ct. 114, 118–19, 71 L.Ed. 303 (1926).

■ The Court's third point in *Connolly* and *Concrete Pipe*—that reasonable investment-backed expectations are greatly reduced in a highly regulated field—applies with special force to rules governing the liability of national banks. *See Fahey v. Mallonee,* 332 U.S. 245, 250, 67 S.Ct. 1552, 1554, 91 L.Ed. 2030 (1947) ("Banking is one of the longest regulated and most closely supervised of public callings."). As the government points out, national banks have been heavily regulated for more than a century, and during that period the principle of limited liability has not been respected to the same extent in the banking field as it has been in other areas of corporate law.

The National Bank Act, which created the system of chartered banks, originally imposed a regime of "double liability" on shareholders of failed banks. *See* Act of June 3, 1864, ch. 106, § 12, 13 Stat. 102–03; Federal Reserve Act, ch. 6, § 23, 38 Stat. 273 (1913). Under the double liability provisions, shareholders of a failed bank were liable to the bank's creditors for an amount up to the par value of their shares, in addition to the amount they had invested in the bank's stock. A number of states, including Maine, adopted similar laws imposing double liability on shareholders of failed banks. *See* Jonathan R. Macey & Geoffrey P. Miller, *Double Liability of Bank Shareholders: History and Implications,* 27 Wake Forest L.Rev. 31, 36–37 (1992). The "double liability" provisions were largely displaced by federal and state systems of deposit insurance, but the double liability regime demonstrates that from the outset, principles of limited corporate liability were not strictly observed in the banking industry.

The Federal Reserve Board, which oversees the operations of bank holding companies, has adopted a different approach to allocating the burdens of bank failures. Nevertheless, like the double liability provisions, the Federal Reserve Board's approach disregards in part the principle of limited corporate liability, this time between bank holding companies and their affiliates. By regulation, the Board in 1984 applied its so-called "source of strength" policy to require each bank holding company to "serve as a source of financial and managerial strength to its subsidiary banks." 12 C.F.R. § 225.4(a)(1) (1995). Through the "source of strength" policy, the Board asserted its authority to pierce the corporate veil between a bank holding company and its affiliated banks, so that a bank holding company could be required to inject capital into a troubled subsidiary bank. *See* Kieran J. Fallon, 66 N.Y.U.L.Rev. at 1365–72; Howell E. Jackson, *The Expanding Obligations of Financial Holding Companies,* 107 Harv.L.Rev. 507, 528–32 (1994). In a policy statement, the Board subsequently explained that "in seeking the advantages flowing from the ownership of a commercial bank, bank holding companies have an obligation to serve as sources of strength and support to their subsidiary banks," and that a bank holding company's failure to assist a troubled or failing subsidiary bank "would generally be viewed as an unsafe and unsound banking practice" and as a violation of the Board's banking regulations. *Policy Statement on the Responsibility of Bank Holding Companies to Act as Sources of Strength to Their Subsidiary Banks,* 52 Fed.Reg. 15,707 (1987). Although the "source of strength" regulation was struck down by the Fifth Circuit on the ground that it was not statutorily authorized, *see MCorp Fin., Inc. v. Board of Governors,* 900 F.2d 852 (5th Cir.1990), that decision was vacated by the Supreme Court on jurisdictional grounds, *see Board of Governors v. MCorp Fin., Inc.,* 502 U.S. 32, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991), and the Board's "source of strength" policy remains in force.

The FDIC in 1983 announced a similar program, under which it conditioned grants of assistance to failing banks pursuant to 12 U.S.C. § 1823(c) on their receipt of financial support from related entities. *See Statement of Policy and Criteria on Assistance to Op-*

*erating Banks Which are in Danger of Failing,* 48 Fed.Reg. 38,669, at 38,670 (1983). In 1986, the FDIC provided that in the case of a failing bank owned by a holding company, the FDIC would expect the holding company to "make a significant contribution toward minimizing the financial exposure of the FDIC." *Statement of Policy and Criteria on Assistance to Operating Insured Banks,* 51 Fed.Reg. 44,122, at 44,123 (1986). At about the same time, the FDIC modified its bank closure policy to treat loans to an insolvent bank from affiliated institutions as having a lower priority than other obligations of the bank, which had the effect of using assets of affiliated banks to underwrite the other obligations of insolvent institutions. *See, e.g., Texas Am. Bancshares, Inc. v. Clarke,* 954 F.2d 329, 334–40 (5th Cir.1992).

In light of the historical practices in the bank regulatory field, including the exceptions to the principle of limited liability created by statute, regulation, and regulatory policy, it would have been unreasonable for the owners of the Maine National Bank to expect that the bank's assets would never be subject to liability based on losses suffered by other members of the BNEC system. *See Golden Pacific Bancorp,* 15 F.3d at 1074; *California Housing Sec., Inc.,* 959 F.2d at 959; *American Continental Corp. v. United States,* 22 Cl.Ct. 692, 697 (1991) ("when an investment is made in such a highly regulated industry, to be reasonable, expectations must be based not only on then-existing federal regulations but also on the recognition that there may well be related changes in the regulations in the future"); *see generally Connolly,* 475 U.S. at 227, 106 S.Ct. at 1027. Although the trial court treated the abrogation of the principle of limited liability under the cross-guarantee provision as a remarkable departure from historical practice, the background of banking regulation reviewed above demonstrates that, in this area, departures from the principle of limited liability are not exceptional at all.

Even outside the banking field, the principle of limited corporate liability is not inviolate. The practice of according limited liability to corporations gained wide acceptance only during the nineteenth century, and it was extended to corporate groups only in the second half of that century. *See* Phillip I. Blumberg, *Limited Liability and Corporate Groups,* 11 J.Corp.L. 573, 609–10 (1986). Even today, the corporate entity may be disregarded when courts find that to do so is "in the interests of public convenience, fairness and equity," *Capital Tel. Co. v. FCC,* 498 F.2d 734, 738 (D.C.Cir.1974), a conclusion that courts are quicker to reach when creditors are trying to reach the assets of corporate affiliates than when the assets of personal shareholders are at stake, *see* Frank H. Easterbrook & Daniel R. Fischel, *Limited Liability and the Corporation,* 52 U.Chi. L.Rev. 89, 110–12 (1985).

In addition, the cross-guarantee provision of FIRREA is not the only federal statute that overrides the principle of limited corporate liability in some circumstances. The Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1301–1461, contains an exception to the rule of limited corporate liability that is virtually identical to the cross-guarantee provision of FIRREA. In imposing liability on employers upon withdrawing from multiemployer pension plans or upon the termination of pension plans, Congress provided that liability would extend not only to the particular employer that belonged to the pension plan, but also to any related entities under "common control." *See* 29 U.S.C. §§ 1301(b), 1362, 1364, 1381; *Pension Benefit Guar. Corp. v. Ouimet,* 630 F.2d 4, 11 (1st Cir.1980), *cert. denied,* 450 U.S. 914, 101 S.Ct. 1356, 67 L.Ed.2d 339 (1981). Although the "common control" provision of ERISA has been challenged under the Takings Clause, the challenges have been uniformly rejected. *See Central States, Southeast & Southwest Areas Pension Fund v. Skyland Leasing Co.,* 691 F.Supp. 6, 15 (W.D.Mich.1987), *aff'd mem.,* 892 F.2d 1043 (6th Cir.1990); *Robbins v. Pepsi–Cola Metro. Bottling Co.,* 636 F.Supp. 641, 663–66 (N.D.Ill.1986); *Lyons v. Raymond Rosen & Co.,* 18 Employee Benefits Cas. 1037, 1051–53, 1994 WL 129955 (E.D.Pa.1994).

Like the cross-guarantee provision of FIRREA, the "common control" provision of ERISA is designed to protect a government insurance fund by extending liability

throughout a group of affiliated organizations and doing so by creating a narrow statutory exception to the principle of limited corporate liability. The analysis in the cases upholding ERISA's "common control" provision against a Takings Clause challenge is thus equally applicable to the cross-guarantee provision at issue in this case. Moreover, Congress's creation of an exception to limited corporate liability such as the "common control" provision of ERISA further undermines Branch's claim that when BNEC purchased the Maine National Bank the new owners had a right to assume that the bank's assets would never be subject to invasion because of the failure of other affiliates within the BNEC system.

### C

Takings law has been criticized as lacking in doctrinal rigor and predictability. Indeed, the Supreme Court has acknowledged that there is no "set formula" for testing a takings claim, and in addressing takings claims other than those involving physical invasions of land, the Court has resorted to what it admits are "ad hoc" inquiries into the circumstances of each case. *Connolly,* 475 U.S. at 224, 106 S.Ct. at 1025. Nonetheless, the general theme underlying the Supreme Court's takings decisions is not difficult to discern. As the Court put the matter in *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960), the Fifth Amendment's guarantee "that private property will not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." We are persuaded that it was fair and just for Congress to impose the burdens of one bank's failure on its sister institutions within the same bank holding company system, rather than imposing that liability on the public as a whole. We therefore find no taking on the facts alleged in this case.

*REVERSED.*