

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-29-1999

# Unity Real Estate Co v. Hudson

Precedential or Non-Precedential:

Docket 97-3234,97-3236

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Unity Real Estate Co v. Hudson" (1999). *1999 Decisions.* Paper 81.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/81

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Volume 2 of 2

Filed March 29, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 97-3234 and 97-3236

UNITY REAL ESTATE COMPANY,
      Appellant No. 97-3234

v.

MARTY D. HUDSON; MICHAEL H. HOLLAND; THOMAS
O. S. RAND; ELLIOTT A. SEGAL; CARLTON R. SICKLES;
GAIL R. WILENSKY; WILLIAM P. HOPGOOD; TRUSTEES
OF THE UNITED MINE WORKERS OF AMERICA
COMBINED BENEFIT FUND; THOMAS F. CONNORS;
ROBERTS WALLACE; TRUSTEES OF THE 1992 UNITED
MINE WORKERS OF AMERICA BENEFIT PLAN; UNITED
STATES OF AMERICA (Intervenor in District Court)

        LTV Corporation (LTV), NACCO Industries,
        Inc. (NACCO); Amicus Curiae

BARNES AND TUCKER COMPANY,
      Appellant No. 97-3236

v.

MARTY D. HUDSON, Trustee of the United Mine Workers
of America Combined Benefit Fund and Trustee of the
1992 United Mine Workers of America Benefit Plan;
MICHAEL H. HOLLAND, Trustee of the United Mine
Workers of America Combined Benefit Fund and Trustee
of the 1992 United Mine Workers of America Benefit Plan;
THOMAS O. S. RAND, Trustee of the United Mine
Workers of America Combined Benefit Fund; ELLIOTT A.
SEGAL, Trustee of the United Mine Workers of America
Combined Benefit Fund; CARLTON R. SICKLES, Trustee
of the United Mine Workers of America Combined Benefit

Fund; GAIL R. WILENSKY, Trustee of the United Mine
Workers of America Combined Benefit Fund; WILLIAM P.
HOPGOOD, Trustee of the United Mine Workers of
America Combined Benefit Fund; THOMAS F. CONNORS,
Trustee of the 1992 United Mine Workers of America
Benefit Plan; ROBERT G. WALLACE, Trustee of the 1992
United Mine Workers of America Benefit Plan; UNITED
STATES OF AMERICA (Intervenor in the District Court)

LTV Corporation (LTV), NACCO Industries,
Inc. (NACCO); Amicus Curiae

On Appeal From the United States District Court
For the Western District of Pennsylvania
(D.C. Civ. No. 93-cv-01802)
District Judge: Honorable D. Brooks Smith

Argued: November 20, 1998

Before: BECKER, Chief Judge, ALDISERT and WEIS,
Circuit Judges.

(Filed March 29, 1999)

4. Conclusion

We have evaluated the Coal Act against our traditional
standards of proportionality and distaste for retroactivity,
taking into account our deference to Congress on the evils
to be addressed by the law. Ultimately, although the issue
is close, we conclude that the Coal Act is targeted to
address the problem of insufficient resources in the benefit
funds and that it puts the burden on those who, in
Congress's reasonable judgment, should bear it. The law's
retroactivity is troubling, yet given the nature of the
commitments at issue and the relationship of Coal Act
liabilities to past acts in the industry, we cannot say that
the Act violates due process.

IV. Categorical Takings

Unity and B&T also maintain that the Coal Act is an
unconstitutional taking as applied to them. They ask us to

46

apply a categorical takings approach because, they claim, their businesses will be entirely destroyed if they have to pay benefits under the Act. In Eastern, the argument that the Coal Act would drive the plaintiff out of business entirely was not presented to the Court, and so the plaintiffs argue that they retain a viable takings claim.

Five Justices, however, rejected the idea that a law that imposed only a financial burden without identifying a particular property right could ever consitute a taking. The fact that in a particular case a financial burden might consume all of a particular entity's assets would not seem to change Justice Kennedy's analysis: "The Coal Act neither targets a specific property interest nor depends upon any particular property for the operation of its statutory mechanisms." Eastern, 118 S. Ct. at 2156 (Kennedy, J., concurring). Similarly, the dissent would require the governmental identification of "a specific interest in physical or intellectual property" in order tofind a compensable taking. Id. at 2161 (Breyer, J., dissenting). The reasoning of these five Justices was that any governmental regulation that costs a business money could become a taking if the plurality's standards prevailed, and that this would be an unacceptable result. See id. at 2155 (Kennedy, J., concurring); id. at 2162 (Breyer, J., dissenting). This reasoning is unaffected by the characterization of the burden as a "total" taking because it consumes all of a particular company's resources. Moreover, even the plurality gave no indication that it would extend the categorical takings approach outside the context of regulations of real property.

Because the Eastern Court was not confronted with this situation, however, we must set forth our reasons for rejecting it in greater detail. To date, the categorical approach has only been used in real property cases such as Lucas v. South Carolina, 505 U.S. 1003 (1992). In those cases, the concept of "total destruction" of value refers not to the owner's total assets but to some identifiable property interest. Indeed, even a multi-billionaire would be eligible for an award under a categorical takings approach if some small, distinct parcel of his holdings were condemned or rendered worthless through regulation. Therefore, the "total

47

destruction" language of cases concerning real property should not be mechanically applied to the situation at bar. See Branch v. United States, 69 F.3d 1571, 1576-77 (Fed. Cir. 1995) ("Because of `the State's traditionally high degree of control of commercial dealings,' the principles of takings law that apply to real property do not apply in the same manner to statutes imposing monetary liability." (quoting Lucas, 505 U.S. at 1027)).

The Supreme Court has repeatedly rejected the argument that a tax--even a tax on a small set of businesses--may violate due process or constitute a taking simply because it may force some of the regulated entities out of business:

> The claim that a particular tax is so unreasonably high and unduly burdensome as to deny due process is both familiar and recurring, but the Court has consistently refused either to undertake the task of passing on the "reasonableness" of a tax that otherwise is within the power of Congress or of state legislative authorities, or to hold that a tax is unconstitutional because it renders a business unprofitable.
>
> . . . . The premise that a tax is invalid if so excessive as to bring about the destruction of a particular business, the Court said, had been "uniformly rejected as furnishing no juridical ground for striking down a taxing act." [Magano Co. v. Hamilton, 292 U.S. 40,] 47 [(1934)]. Veazie Bank v. Fenno, 8 Wall. 533, 548, 19 L.Ed. 482 (1869); McCray v. United States, 195 U.S. 27, 24 S.Ct. 769, 49 L.Ed. 78 (1904); and Alaska Fish Salting & By-Products Co. v. Smith, 255 U.S. 44, 41 S.Ct. 219, 65 L.Ed. 489 (1921), are to the same effect.
>
> In Alaska Fish, a tax on the manufacture of certain fish products was sustained, the Court saying, id., at 48-49, 41 S.Ct., at 220: "Even if the tax should destroy a business it would not be made invalid or require compensation upon that ground alone. Those who enter upon a business take that risk. . . ." See also International Harvester Co. v. Wisconsin Dept. of Taxation, 322 U.S. 435, 444, 64 S.Ct. 1060, 1065, 88 L.Ed. 1373 (1944); Child Labor Tax Case, 259 U.S. 20, 30, 42 S.Ct. 449, 66 L.Ed. 817 (1922); Brushaber v.

Union Pacific R. Co., 240 U.S. 1, 24, 36 S.Ct. 236, 244, 60 L.Ed. 493 (1916); Flint v. Stone Tracy Co., 220 U.S. 107, 168–169, 31 S.Ct. 342, 356, 55 L.Ed. 389 (1911).

City of Pittsburgh v. Alco Parking Corp., 417 U.S. 369, 373–74 (1974). We note in this regard that we, along with other Courts of Appeals, have held that Coal Act obligations are taxes. See Lindsey Coal Mining Co. v. Chater, 90 F.3d 688, 695 (3d Cir. 1996) (finding that the Act is "essentially a tax to continue a benefits program").

The plaintiffs respond that these taxation cases all concerned prospective, not retrospective, liability, but that argument conflates two separate issues. The size of the liability does not depend on whether or not the obligation is retrospective. If the argument is that the complete consumption of a company's assets is a categorical taking, retroactivity would be irrelevant; if such a law would only be a categorical taking when it was retroactive, then we are not really discussing a "categorical" taking. We think that retroactivity, while crucial to our due process analysis, is not properly considered as a part of the categorical takings analysis.

The Court of Appeals for the Federal Circuit has also rejected the plaintiffs' argument, with reasoning wefind persuasive:

> The constitutionality of the assessment should not depend on the happenstance of the financial condition of the assessed bank at the time of the assessment. We are unaware of any principle of takings law under which an imposition of liability is deemed a per se taking as to any party that cannot pay it. It would be perverse to hold that a statute resulting in a $99 million liability would be constitutional as applied to any [entity] having a net worth of more than $100 million but unconstitutional per se as to any member having a net worth of less than $100 million. The assessment in both cases is based on the same theory of liability and should meet the same constitutional fate.

Branch v. United States, 69 F.3d at 1577. 15 Branch

---

15. The plaintiffs dispute the Branch court's reasoning by citing to Lucas,
in which the Court wrote:

49

recognizes that general regulatory laws, unlike the particularized applications of zoning regulations that are the typical targets of takings challenges, usually have the kind of general applicability that mutes the concerns behind takings jurisprudence. The broader the reach of a law, the less likely it is that a powerless segment of society is being unfairly singled out to bear a burden that society as a whole should bear.16

As the concurrence and the dissent in Eastern suggest, considerable practical problems would arise were we to find plaintiffs' categorical takings claim cognizable. For example, we would have to decide at what point we could justify granting relief on these grounds. Unity will go out of business as soon as it is ordered to pay. B&T, by contrast, will apparently go under in two years, when its liabilities under the Act consume the last of its reserves. Should we wait until B&T is in the same position as Unity? Would being a year away from bankruptcy be enough? Should

_____

> It is true that at least in some cases the landowner with 95% loss will get nothing, while the landowner with total loss will recover in full. But that occasional result is no more strange than the gross disparity between the landowner whose premises are taken for a highway (who recovers in full) and the landowner whose property is reduced to 5% of its former value by the highway (who recovers nothing). Takings law is full of these "all-or-nothing" situations.

Lucas, 505 U.S. at 1019 n.8. However, Lucas is inapposite. In Lucas, there was a strip of affected beachfront land; that land was reduced to zero value by regulation; that was a taking. The Court did not inquire into whether the landowners had enough other resources to survive the reduction in value, because that was not relevant to the test. All that was necessary was to look at the value of the affected land. Under the plaintiffs' interpretation, the Court should have examined Mr. Lucas's financial condition before and after the regulation at issue, and there would not have been a categorical taking if Mr. Lucas remained in the black. This suggests the difficulties with a takings analysis that is unanchored to a specific property interest.

16. Breadth of application has its own dangers, however, and one of those dangers is that a law will have irrationally large effects on regulated businesses. Our substantive due process jurisprudence has developed to address this situation, as we discuss supra in Section III.

B&T be required to show that there is no potential"white knight" that might rescue it from destruction? Alternatively, we might reduce B&T's obligations instead of eliminating them entirely so that it could limp along, never showing a profit but never going under. That would arguably be an appropriate, constitutional remedy for the threatened harm, the way that transferable use credits can mitigate what would otherwise be a taking when zoning restrictions are at issue. See Penn Central Transp. Co. v. City of New York, 438 U.S. 104 (1978). If it is the total destruction of the business that converts the Act into a taking, then perhaps we should simply declare that part of the obligation that will drive B&T out of business a taking and approve the rest. Yet this would only plunge courts further into the intricacies of business finance.

Deciding for Unity and B&T because they will be forced into bankruptcy by the Coal Act would open up a Pandora's Box that would throw into question every economic regulation imaginable. Companies could adjust their accounting practices to prove that any particular regulation would be enough to destroy them as profitable enterprises. The problem would be compounded if, as counsel for plaintiffs suggested at oral argument, we should evaluate the financial status of an entity without looking at its corporate relatives for takings purposes. A corporation subject to expensive regulation at some of its production facilities could create a series of subsidiaries, each of which would be insolvent on its own if forced to comply with a particular set of regulations, and claim constitutional protection against enforcement of the regulations, even though a different corporate configuration would remain solvent.[17]

_____

17. A supporting in terrorem argument is not difficult to devise. For example, an employer could resist an increase in the minimum wage on the ground that the increased cost would drive it out of business. Similarly, many small-business owners find that anti-discrimination laws generate significant expenses, and some might be forced out of business by compliance costs. See Mike Hudson, Jobs for Disabled People: Handicapping Businesses, Roanoke Times & World News, July 30, 1995, at F1. While such concerns might very well prove overstated in most cases, courts would be forced into the dismal business of economic

A decision on these grounds would also open the door to plaintiffs attempting to choose government regulations from which they wanted to be excused. It is notable that B&T repeatedly discusses its other expensive government-imposed obligations, which involve cleaning up polluted coal mines and paying out black lung benefits. The Coal Act alone, according to B&T's submissions, would not necessarily put B&T out of business; it is only because the environmental and black lung obligations are so large that this additional expense overwhelms B&T. There is nothing in B&T's constitutional argument about "total takings" that distinguishes its other obligations from those imposed by the Coal Act, nor is there a conceptual reason to confine this definition of total takings to retroactive laws.

We decline to enter into the conceptual morass that would be engendered by the plaintiffs' total takings theory. That a regulation will put a particular plaintiff out of business cannot be proof that a taking has occurred. Instead, the size of the deprivation inflicted by a law must be evaluated in the context of the other relevant facts. In Connolly, the Court noted that the MPPAA "completely deprives an employer of whatever amount of money it is obligated to pay to fulfill its statutory liability." Connolly, 475 U.S. at 225. But this did not lead to the conclusion that there had been a taking because "[t]here is nothing to show that the withdrawal liability actually imposed on an employer will always be out of proportion to its experience with the plan, and the mere fact that the employer must pay money to comply with the Act is but a necessary consequence of the MPPAA's regulatory scheme." Id. at 226.

We do not gainsay that the liability imposed on Unity in particular is troubling. Unity's assets are tiny, and its Coal Act liabilities dwarf them. If we uphold the defendants'
_____

prediction. Every economic regulation would have to be litigated on a case-by-case basis. See Sheila A. Moloney, The Lady in Red Tape, Policy Review, Sept./Oct. 1996, at 48 (discussing various regulations that threaten the financial viability of specific businesses, including OSHA safety regulations, FTC franchising rules, ADA accessibility requirements, Endangered Species Act development restrictions, and EPA Superfund clean-up costs).

52

position, this small family business will be bankrupted instantly. But the size of a liability only weighs in favor of finding a taking insofar as it is out of proportion to the legitimate obligations society may impose on individual entities. And, as we have discussed in Part III, wefind the proportionality test satisfied in this instance.

V. Conclusion

We hold that Congress could reasonably determine that the plaintiffs, along with other coal operatiors in similar situations, placed the coal industry retiree benefit funds in jeopardy after creating an expectation of lifetime benefits. Moreover, the actions that created the need for the Coal Act are not so far in the past as to make it fundamentally unjust to impose liability upon the plaintiffs, because the burden is proportional to their contribution to the problem and the retroactivity is not too extensive. We do not deny that Unity, in particular, presents a sympathetic case. This family business has slowly decreased in size as the economic changes of the past decades have buffeted it. Yet small businesses, even businesses that have suffered from the eroding pressures of time and economic change, cannot be immune from reasonable government regulation simply because that regulation has harsh effects. The Coal Act may not be an ideal law; it may not even be a wise one. But its wisdom, or lack thereof, in a particular case does not determine its constitutionality.

For the foregoing reasons, the judgment of the District Court will be affirmed.

53

ALDISERT, Circuit Judge, concurring:

I agree with the majority's determination that the 1992 Coal Industry Retiree Health Benefit Act, 26 U.S.C. SS 9701–9722 (1994 and Supp II) ("Coal Act"), as applied to Unity Real Estate Company and Barnes and Tucker Company does not violate substantive due process and is not an unconstitutional taking. I agree also that the retroactive scope of the Act is not beyond appropriate legislative power.

Although Appellants vigorously contend that their cases are analogous to Eastern Enterprises v. Apfel, 118 S. Ct. 2131 (1998), their analogical argument fails because the decisive material facts of the cases bear no similarity. The decisive material facts in Eastern Enterprises are that the company (1) left the coal industry in 1965 and (2) was never a party to the 1974 and later Wage Agreements that first suggested the commitment to lifetime benefits for retirees and family members. See Eastern Enterprises, 118 S. Ct. at 2150 (plurality opinion). Unlike the former coal operator in Eastern Enterprises, Appellants remained in the coal industry until 1981 and 1984 respectively, and participated in negotiations for the 1974 and later Wage Agreements. As emphasized in Eastern Enterprises, "It is the 1974, 1978 and subsequent agreements that first suggest an industry commitment to the funding of lifetime health benefits for both retirees and their family members." Id. Appellants' act of signing the 1974 and subsequent National Bituminous Coal Wage Agreements (NBCWA or "Wage Agreement") precludes the rote application of Eastern Enterprises to these cases.

I.

On the due process question of "promises" and "representations" made to the miners, I would sustain the constitutionality of the Act as applied to the Appellants for one reason only: The evidence before Congress provided a rational basis to believe that a promise of lifetime benefits had been made. Congress relied on the Coal Commission Report, its appendices and the Commissioners' testimony at the Senate hearing. For example, the Coal Commission Report stated:

54

The Commission firmly believes that retired miners are entitled to the health care benefits that were promised and guaranteed them and that such commitments must be honored. . . .

Retired coal miners have legitimate expectations of health care benefits for life; that was the promise they received during their working lives and that is how they planned their retirement years. That commitment should be honored.

See Supp. App. at 350, 360 (Secretary of Labor's Advisory Commission on United Mine Workers of America Retiree Health Benefits, Coal Commission Report (1990)). These were important findings that were accepted by Congress.

Whether the Commission Report accurately portrayed the state of affairs in the coal mining industry at the time the 1974 Wage Agreement was negotiated and signed is largely irrelevant to what should be our analysis of the Coal Act's constitutionality. In considering the question of who promised what to whom, I do not believe that it is appropriate for any reviewing court to review de novo the history of the agreements or to parse their language.

I say this because, to paraphrase Holmes, "That's not our job."[1] Once we get beyond that portion of the Due Process or Takings Clause analysis relating to the Coal Act's financial effect on the Appellants, we must address whether there was deprivation of property without due process of law on the theory that the Appellants never promised any benefits beyond the lifetime of the Wage Agreements. Our job is not to examine the materials and to make an independent determination of this issue, a sort of ersatz fact-finding by either a federal trial or appellate court.

_____

1. Learned Hand once reminisced: "I remember once I was with [Holmes]; it was a Saturday when the Court was to confer. It was before we had a motor car, and we jogged along in an old coup). When we got to the Capitol, I wanted to provoke a response, so as he walked off, I said to him: `Well, sir, goodbye. Do justice!' . . . He replied: `That is not my job.
My job is to play the game according to the rules.' " Learned Hand, Continuing Legal Education for Professional Competence and Responsibility, Report on the Arden House Conference, at 116-123 (1958).

On this issue, as I see it, our job is merely to determine whether substantial evidence was presented before Congress on this issue. And I conclude that there was. The Coal Commission Report and other testimony before the Senate Committee informed Congress that "[r]etired coal miners have legitimate expectations of health care benefits for life; that was the promise they received during their working lives and that is how they planned their retirement years. That commitment should be honored." Supp. App. at 360 (Secretary of Labor's Advisory Commission on United Mine Workers of America Retiree Health Benefits, Coal Commission Report (1990)). This determination serves as the rational basis for the legislation.

Our sole obligation is "to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence." Turner Broadcasting Sys. Inc. v. Federal Communications Comm'n, 520 U.S. 180, 195 (1997) (internal quotations omitted). Substantial evidence "does not mean a large or considerable amount of evidence, but rather `such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. National Labor Relations Bd., 305 U.S. 197, 229 (1938)). "We owe Congress'findings deference in part because the institution is far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon legislative questions." Turner, 520 U.S. at 195 (internal quotations omitted). On the basis of the record before Congress, I would conclude that there was substantial evidence to provide Congress with a rational basis for believing that the Coal Act was consistent with promises that had been made by coal operators to their former employees.

II.

Important prudential considerations undergird the Court's limitations on the judicial role. In the case at bar, reasonable persons can differ in evaluating the history of the critical Wage Agreements and interpreting its provisions. For example, although the majority has made a thorough and scholarly analysis of these circumstances, my

56

own conclusions would be somewhat different. I would not rely on promises and representations made apparently dehors the explicit language of the Wage Agreements.

Critical to me is that the Wage Agreements expressly limited all of the promised retiree health benefits to the term of each agreement. Miners who retired after 1975, but whose former employers were no longer in the coal mining business, were promised benefits through the United Mine Workers of America 1974 Benefit Plan and Trust ("1974 Plan"). See Eastern Enterprises, 118 S. Ct. at 2139-2140. Article XX(c)(3)(ii) of the NBCWA stated that the purpose of the 1974 Plan was to provide employee health benefits only "during the term of this Agreement." Similarly, Article II of the 1974 Plan expressly stated that if the plan assets were to "become insufficient" to continue providing benefits after the NBCWA had expired, "the benefits may be suspended or reduced to amounts which, in the judgment of the Trustees, can be paid from the net assets." The NBCWA contained a "General Description" of all promised benefits that expressly stated that health benefits were"guaranteed" at fixed levels only "during the term of this Agreement." Similar provisions are found or incorporated in other agreements. I simply can find no evidence of any"promise" of lifetime benefits contained in any Wage Agreement. Any reliance on extra-contractual "promises" looks to a novel theory of law that turns a blind eye to the centuries-old law of contracts and to the current law on collective bargaining agreements.

To suggest that the clear language limiting benefits to the term of the Wage Agreement is trumped by the "lifetime" health card is a stretch.[2] By analogy, one could say that possession of a Social Security card "for life," without more and without any proof of disability, entitles one to benefits.

_____

2. The basis for the claim of a "lifetime" health card is in the "General Description" of the 1974 NBCWA, which states:

> Any pensioned miner covered in this Plan will retain his Health Services card until death, and upon his death his widow will retain a health Services card until her death or remarriage.

See Appellants' Supp. Br. at 6-7.

The "evergreen" clauses included in the 1978 Wage Agreement do not persuade me to reach a different result: My reading of these clauses is that they addressed only employer funding, not the scope of the underlying employee benefits.

As a native of Carnegie, Pennsylvania--a coal mining and steel mill town near Pittsburgh--who is old enough to remember the organizational efforts of John L. Lewis in the coal fields in the 1930s and the 1947 Krug-Lewis Agreement, I no doubt have a unique perspective. I know first-hand the mantra of every coal miner through decades of strikes and picketing: "No Contract, No Work."

To the miner, the actual contract controlled, not the expectation of future agreements. Without the contract in hand, the miners would not pick up their lamps at the lamp house and descend into the shafts. They worked under the precise language in a given contract and under no other representations. The sordid history of the coal company towns that surrounded Carnegie, and the inhumane treatment of the miners and their families prior to effective unionization in the mines, impelled the miners to require thereafter that every representation of working conditions and benefits be set forth in clear language in a hard-fought written collective bargaining agreement.

The foregoing discussion is but my gratuitous interpretation of some of the history and contents of the Wage Agreements, and admittedly, it may be contrary to that expressed in most other judicial opinions. My views and those of judges with contrary interpretations are important in one respect only: My views and those of other judges are totally irrelevant. What is relevant is only that on the basis of evidence before it, Congress concluded that a promise of lifetime benefits had been made. This furnished the rational basis for enacting the controversial provisions of the Coal Act.

III.

This, too, must be said. I am conscious that in light of the view that we take here, the handwriting is on the wall that a kind of hydraulic pressure will generate economic

58

disasters in companies whose financial circumstances are similar to Unity and Barnes and Tucker. Without additional and more realistic Congressional intervention, we may see a phenomenon of the "last man standing," as companies disappear from the economic scene and responsibility for paying benefits shifts to surviving companies. If this case is any example and a forerunner of things to come, the operation of the present statutory solution to the vexing health benefit problem of retirees and their dependents may serve as a full employment program for bankruptcy lawyers of companies unable to make prescribed payments. Sadly, I do not believe that this statement is an argumentum ad terrorem.

I join in the judgment of the court.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit