**PERPETUAL FINANCIAL CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 95–497C.

United States Court of Federal Claims.

June 25, 2004.

Burton L. Raimi, Sarasota, Florida, counsel for plaintiff Perpetual Financial Corp.

Tonia J. Tonatore, United States Department of Justice, Civil Division Commercial Litigation Branch, counsel for defendant, with whom were Deputy Assistant Attorney General Stuart E. Schiffer, Director David M. Cohen, Deputy Director Jeanne E. Davidson, Assistant Director Mark A. Melnick, Arlene Pianko Groner, and David C. Hoffman, of counsel.

Ellis Merritt, Jr. and Mary Ann McNamar, counsel for plaintiff-intervenor Federal Deposit Insurance Corporation.

## MEMORANDUM OPINION AND FINAL JUDGMENT

BRADEN, Judge.

This term in *McConnell v. Federal Election Comm'n*, 540 U.S. 93, 124 S.Ct. 619, 157

L.Ed.2d 491 (2003), Chief Justice Rehnquist delivered the portion of the Court's opinion on standing. Again, the lower courts were reminded of our constitutional obligation to evaluate the three requirements that constitute the "'irreducible constitutional minimum'" (citing *Vermont Agency of Natural Resources v. United States ex rel. Stevens,* 529 U.S. 765, 771, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000)):

> First, a plaintiff must demonstrate an "injury in fact," which is "concrete," "distinct and palpable," and "actual or imminent." *Whitmore v. Arkansas,* 495 U.S. 149, 155[, 110 S.Ct. 1717, 109 L.Ed.2d 135] (1990). Second, a plaintiff must establish "a causal connection between the injury and the conduct complained of—the injury has to be 'fairly trace[able] to the challenged action of the defendant, and not ... th[e] result [of] some third party not before the court.'" *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–561[, 112 S.Ct. 2130, 119 L.Ed.2d 351] (1992) (quoting *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 41–42[, 96 S.Ct. 1917, 48 L.Ed.2d 450] (1976)). Third, a plaintiff must show the "'substantial likelihood' that the requested relief will remedy the alleged injury in fact.'" *Stevens, supra,* at 771, 120 S.Ct. 1858[.]

*Id.* at ——, 124 S.Ct. at 707 (citations omitted).

In this case, plaintiff has failed to establish both the threshold injury in fact and the causal connection tests required to establish standing under Article III of the United States Constitution. Accordingly, this case must be dismissed because, as Justice Scalia observed in delivering the Ninth Donahue Lecture at Suffolk University Law School, while a Judge on the United States Court of Appeals for the D.C. Circuit:

> The requirement of standing has been made part of American constitutional law through (for want of a better vehicle) the provisions of Art. III, Sec. 2, which states that 'the judicial power shall extend' to

certain "cases and controversies." ... an accurate description of the sort of business courts had traditionally entertained, and hence of the distinctive business to which they were presumably to be limited under the Constitution.

Antonin, Scalia, "The Doctrine of Standing as an Essential Element of the Separation of Powers," 17 SUFFOLK U.L. REV. 881, 882 (1983). Standing, therefore, is not merely some "procedural" requirement, but instead one of substantive law at the very heart of the separation of powers doctrine, on which our federal system of government was founded and relies for its continued vitality. The Supreme Court long has held that standing is jurisdictional, "inflexible and without exception[.]" *Mansfield v. Swan,* 111 U.S. 379, 382, 4 S.Ct. 510, 28 L.Ed. 462 (1884). Accordingly, the court has an obligation to raise standing even though the parties, as in this case, "are prepared to concede it." *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *see also Anderson v. United States,* 344 F.3d 1343, 1351 (Fed.Cir.2003) (holding that "a plaintiff must be in privity of contract with the United States" to have standing to sue the sovereign on a breach of contract claim); *Federal Deposit Ins. Corp. v. United States,* 342 F.3d 1313, 1319–20 (Fed.Cir.2003) (holding shareholders do not have standing where they were not signatories to the regulatory agreements nor third-party beneficiaries designated to be directly benefited); *Bailey v. United States,* 341 F.3d 1342, 1346 (Fed.Cir.2003) (where a shareholder is not a party to a regulatory assistance agreement it does not have standing to pursue takings claims); *Castle v. United States,* 301 F.3d 1328, 1338 (Fed.Cir.2002) (where parties are not signatories to a regulatory assistance agreement nor the expressly intended beneficiaries, independent of shareholder status, they do not have standing).

## FACTUAL BACKGROUND [1]

This case is among the progeny of *Winstar Corp. v. United States,* 25 Cl.Ct. 541 (1992)

---

1. The facts herein are derived from: plaintiff's April 3, 1998 Appendix ("Pl.App.Ex."); defendant's July 29, 2003 Appendix ("Def.App."); defendant's December 19, 2002 Appendix ("Def.App.II"); plaintiff's September 29, 2003 Appendix ("Pl.Supp.App."); and plaintiff's post hearing November 25, 2003 Supplemental Appendix ("Pl.Supp.App.II").

("*Winstar I*"), *aff'd,* 64 F.3d 1531 (Fed.Cir. 1995) (en banc) ("*Winstar II*"), *aff'd,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) ("*Winstar III*").

## A. In 1982, Perpetual American Savings And Loan Association Acquired Washington & Lee Savings And Loan Association.

On January 7, 1982, Washington & Lee Savings & Loan Association ("W & L"), a federally-chartered savings and loan association located in Northern Virginia, and Perpetual American Savings and Loan Association ("Perpetual American"), in Washington, D.C., entered into an Agreement and Plan of Reorganization. *See* Pl.App. Ex. D at 1. Because W & L was the primary asset of First Financial of Virginia Corporation ("FFV"), a stock savings and loan association, Perpetual American first offered to acquire up to 100% of the outstanding shares of

> References also are made herein to: the Federal Deposit Insurance Corporation's March 14, 1997 Complaint ("FDIC Compl."); plaintiff's May 14, 1997 First Amended Complaint ("Amend.Compl."); plaintiff's April 3, 1998 Motion for Summary Judgement ("Pl.Mot.Sum. J."); defendant's July 29, 2003 Motion for Summary Judgment ("Def.Mot.Sum. J."); plaintiff's September 29, 2003 Reply ("Pl.Reply"); plaintiff's November 25, 2003 Supplemental Brief ("Pl.P.H. Br."); defendant's December 8, 2003 Response ("Def.P.H. Resp."); and plaintiff's December 18, 2003 Reply ("Pl.P.H. Reply").
>
> In addition, references are made to: the FDIC's November 19, 2002 Renewed Motion to Substitute ("FDIC Mot."); defendant's December 19, 2002 Motion to Dismiss the FDIC and to Dismiss the Derivative and Non–Contractual Claims of [Perpetual Financial] ("Def. Mot. to Dismiss"); the FDIC's January 21, 2003 Opposition ("FDIC Opp."); defendant's February 7, 2003 Reply ("Def. Reply to FDIC"); plaintiff's February 11, 2003 Response to the FDIC Mot. and Def. Mot. to Dismiss ("Pl. Resp. to FDIC/Def. Mot."); and FDIC's February 27, 2003 Reply to [Perpetual Financial] ("FDIC Reply").

2. Perpetual American's merger applications for W & L and Guardian have not been located during discovery in this case. *See* Pl. P.H. Br. at 2 note 2. Perpetual Financial argues that because RTC took physical control of and seized the records of Perpetual American's successor, Perpetual Savings, all "reasonable inferences" should be drawn in favor of Perpetual Financial, regarding the amortization of goodwill. *Id.; see also* Pl. P.H. Reply at 2–3. The Government counters that "PFC's inability to locate regulatory applications submitted by Perpetual to acquire Guardian

FFV. *See* Pl.App. Ex. D at 1–2. Then, W & L was dissolved and converted into a federally-chartered mutual savings and loan association and merged into Perpetual American. *Id.; see also* Pl. Supp.App. at 141–42.

This transaction was treated as a supervisory merger requiring approval of both the FHLBB and the FSLIC.[2] *See* Pl.App. Ex. D at 9. On June 29, 1982, the FHLBB issued Resolution No. 82–440 approving the merger subject to certain conditions, including that Perpetual American would furnish an opinion from an independent accountant certifying: "(a) the purchase method of accounting[3] for the merger [was] applicable based on the criteria contained in Memorandum SP–24[4] and (b) the purchase accounting adjustments to the recorded values of the assets and liabilities of [W & L were] computed in accordance with [GAAP]." Pl.App. Ex. L at 1–2.

> or Washington–Lee ... is an indication of the lack of significance that the management of PFC placed upon those documents." Def. P.H. Resp. at 3. In addition, "[t]he thirteen-year lapse of time between PFC's suit and the creation of the applications is reason enough to explain the inability to locate the applications in the Government's files[.]" *Id.*
>
> Assuming *arguendo* that Perpetual American required the relevant federal regulatory agencies to afford Perpetual American preferential treatment as to supervisory goodwill, whether such an offer was accepted would be reflected in the responses of the FHLBB and FSLIC, that are part of the record. Therefore, the court is not required to make any inferences regarding the intent of the relevant federal regulatory agencies.

3. Under the purchase method of accounting, "the assets acquired and liabilities assumed by Perpetual American were recorded for financial reporting purposes at their estimated fair market values as of the dates of acquisition." Pl. Supp. App. at 142.

4. FHLBB Memorandum SP–24, issued in December 1981, allowed savings and loans associations to amortize goodwill for up to 40 years in certain circumstances. *See* Pl. Supp.App. 74–84 (SP–24) at 82–84. Prior to the adoption of FHLBB Memorandum SP–24, the FHLBB and the FSLIC allowed savings & loan institutions to amortize goodwill only for a period of up to ten years. *See* Pl. Supp.App. at 29. On June 29, 1982, the date that FHLBB Resolution No. 82–440 was issued, savings and loans institutions were permitted to follow GAAP rules that allowed amortization for up to forty years. *Id.*

FHLBB Resolution No. 82–440 also provided:

> the approval of the merger of [W & L] and Perpetual [American] is necessary to prevent the probable failure of [W & L]; and . . . the merger of [W & L] and Perpetual [American] is instituted for supervisory reasons and is a 'supervisory merger-conversion' within the meaning of 12 C.F.R. § 546.2(d)(2), § 552.13(c)(1)(ii) and § 552.13(h)(6); and . . . the grounds set forth in 12 U.S.C. § 1464(d)(6)(A)(i) exist or will soon exist with respect to [W & L] in that [W & L] is or soon will become insolvent;[5] and . . . the Secretary . . . is authorized and directed to send to Perpetual [American] a letter concerning the forbearance of the FSLIC with respect to certain regulatory requirements (a copy of which letter is in the Minute Exhibit File); and . . . for a reasonable period of time, not to exceed two years from the dates of this resolution, Perpetual American, as a result of the transaction hereinbefore approved shall not be deemed to be in compliance with Section 545.9–1 of the Federal Regulations[.]

Pl.App. Ex. L at 2–3.

On June 29, 1982, the FHLBB forbearance letter, authorized by Resolution No. 82–440, was issued providing that W & L assets acquired by Perpetual American would be "excluded from the computation of scheduled items in determining whether Perpetual [American] meets the requirements of [any section of the regulations of the FHLBB where scheduled items are referred to as assets]." *See* Def.App. at 256. In addition, the FSLIC agreed to forbear for a period of five years (*i.e.*, until June 29, 1987) "from exercising its authority . . . for any failure of Perpetual [American] to meet the net worth requirements of . . . Section 563.13 [requiring adequate capital reserves][6] arising from scheduled items attributed to Washington Lee." *Id.*

Thereafter, Perpetual Savings applied the purchase method of accounting to the W & L merger and recorded $97.4 million in goodwill,[7] *i.e.*, the difference between the book value of the liabilities assumed and the market value of the assets acquired. *See* Def. App. at 305 (Perpetual Savings Notes to Consolidated Financial Statements Oct. 31, 1982 and 1981); *see also* Pl. Supp.App. at 142.

In this case, FHLBB Resolution No. 82–440 utilized almost identical language to the FHLBB Resolution No. 81–710, which authorized the use of purchase method of accounting in the Glendale Federal Bank merger. *See Winstar III*, 518 U.S. at 862, 116 S.Ct. 2432; *see also Winstar II*, 64 F.3d at 1540–42. But, in that case, a "Supervisory Action Agreement" contained an integration clause specifically incorporating both the FHLBB Resolution and the merger agreement. *See Winstar III*, 518 U.S. at 861–62, 116 S.Ct. 2432; *see also Winstar II*, 64 F.3d at 1541–42 ("We conclude based on all of the contemporaneous documents, which under the integration clause of the SAA collectively constituted the 'Agreement' of the parties,

---

**5.** A July 28, 1982 letter from the Chairs of the Board of Directors of both Perpetual Savings and W & L to the FHLBB indicated that immediately prior to the consummation of the merger, W & L sold certain securities that caused W & L's net worth to decrease by about $6 million, *i.e.*, from a net worth of $4 million to a negative figure of about $2 million. *See* Pl. Supp.App. II at 37–38 (describing W & L as "insolvent.").

**6.** 12 C.F.R. § 563.13(b) (1987) required that "the minimum regulatory capital requirement for any calendar quarter (commencing with the quarter ending March 31, 1987) shall be an amount equal to the sum of an institution's liability component and contingency component minus its maturity matching credit."

**7.** Goodwill is "an intangible asset . . . the excess of cost over the fair value of the identifiable net assets acquired." *Coast Federal Bank, F.S.B. v. United States*, 323 F.3d 1035, 1039 (Fed.Cir. 2003) (*en banc*); *see also* RICHARD E. BAKER ET AL., ADVANCED FINANCIAL ACCOUNTING 12 (5th ed. 2002) ("Each identifiable asset and liability acquired is valued at its fair value at the date [of acquisition]. Any amount of the purchase price in excess of the fair value of the identifiable assets and liabilities acquired is viewed as the price paid for goodwill."); *Winstar III*, 518 U.S. at 849, 116 S.Ct. 2432 ("Goodwill recognized under the purchase method as the result of an FSLIC sponsored supervisory merger was generally referred to as 'supervisory goodwill.' Recognition of goodwill under the purchase method was essential to supervisory merger transactions of the type at issue in this case.").

that the Bank Board and the FSLIC were contractually bound to recognize the supervisory goodwill and the amortization periods reflected in the approved accountants' letter [which was authorized by the Resolution].").

Significantly, however, FHLBB Resolution No. 82–440 governing Perpetual American's merger with W & L did not have an integration clause, nor was it issued subject to another agreement with an integration clause. Accordingly, the record in this case does not evidence any mutuality of intent between Perpetual American and the FHLBB or the FSLIC regarding the treatment of any "supervisory goodwill," resulting from Perpetual American's merger with W & L. *Compare* RESTATEMENT (SECOND) OF CONTRACTS § 50(1) (1981) ("RESTATEMENT") (as a prerequisite for contract formation there must be acceptance, *i.e.,* "a 'manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer.'"); *with Anderson v. United States,* 344 F.3d 1343, 1355 (Fed.Cir.2003) (referring to FHLBB resolution as "a regulatory condition rather than a statement of mutual assent"); *Cal. Fed. Bank, F.S.B. v. United States,* 245 F.3d 1342, 1346–48 (Fed. Cir.2001) (holding that where an integration clause was present or forbearance letters approved the amortization of goodwill for specific time periods, a contract was established).

**B. In 1982, Perpetual American Savings And Loan Association Acquired Guardian Federal Savings And Loan Association.**

On May 4, 1982, Perpetual American submitted an application to the FHLBB to acquire another troubled federally-chartered savings and loan association, Guardian Federal Savings and Loan Association ("Guardian"), located in Maryland. To enable Perpetual American "to coordinate its proposed merger activities, it [was] requested that the mergers of Guardian and Washington–Lee ... be approved by the FHLBB simultaneously." Def.App. at 248. Perpetual American advised the FHLBB that it did not require the FSLIC "to provide any financial assistance to the resulting association." *Id.*

at 241. Nor did Perpetual American require the use of purchase method of accounting, *i.e.,* a 40 year amortization period or counting "supervisory goodwill" towards required regulatory capital. *See* Def.App. at 241–49. This offer was not accepted and the parties continued negotiations. *See* Pl. Reply at 12.

On June 3, 1982, a Regional FHLBB Director recommended approval of Perpetual [American's] proposal to FSLIC:

since [the merger] will provide a definite long-run solution to the Guardian problem at no extra cost to the FSLIC. However, it will be a lengthy and complex process to prepare and administer an Assistance Agreement satisfactory to meet the requirements of Perpetual['s] proposal. I therefore suggest that we negotiate a cash up-front deal with Perpetual ... To make Perpetual ... more receptive to our cash offer and to avoid unnecessarily delaying an unassisted acquisition of a problem association, I recommend that we deliver Washington–Lee S & LA to Perpetual ... simultaneously with its acquisition of Guardian. Perpetual['s] proposal to acquire Washington–Lee on an unassisted basis expires on June 10, 1982. After June 10, 1982 Perpetual ... and [W & L] will enter into a renegotiation of the acquisition. Should this happen it is likely that Perpetual will request FSLIC financial assistance because of the continuing financial problems at Washington–Lee.

*See* Pl. Supp.App. II at 22–23.

A July 28, 1982 memorandum from the FSLIC Director to the FHLBB also concluded that: "the acquisition of Guardian is a purchase transaction under generally accepted accounting principles, and accordingly ... the assets and liabilities of Guardian should be recorded at their fair market value." *Id.* at 4. Moreover, "[i]n view of Perpetual [American]'s strong reserve position and effective management, its use of purchase accounting, and in light of the assistance to be provided by FSLIC, we believe that it can survive the foreseeable future and successfully absorb the Guardian acquisition." *Id.* at 10.

On July 28 and 29, 1982, a Merger Agreement was executed by Perpetual American

and then Guardian. *See* Pl.App. Ex. E. On July 29, 1982, the FHLBB issued Resolution No. 82–515, approving the merger, premised on an analysis that it was necessary to "prevent the probable failure of Guardian." *See* Pl.App. Ex. M at 2. This "supervisory" merger, however, was conditioned on the execution of a separate Assistance Agreement between Perpetual American and the FSLIC, under which the FSLIC would agree to contribute "certain assistance and indemnification to Perpetual [American]." Pl.App. Ex. M at 1; *see also* Def.App. at 285–89. Resolution No. 82–515 also directed that the FHLBB issue a forbearance letter to Perpetual American to address certain regulatory requirements. *See* Pl.App. Ex. M at 3. In addition, approval of the merger was further conditioned on Perpetual American submitting a certification from an independent accountant that the merger complied with GAAP, which would be "considered satisfactory evidence that Perpetual's use of the purchase method of accounting is in accordance with GAAP." *See* Pl.App. Ex. M at 2. Perpetual American complied. *See* Def.App. at 250.

On July 30, 1982, pursuant to Resolution No. 82–515, the terms of an Assistance Agreement were finalized between Perpetual American and the FSLIC. *Id.* at 280–97. This agreement, however, did not mention the terms "goodwill," "supervisory goodwill," or "purchase accounting," but did include the following "integration" or "merger" clause:

> This Agreement, together with any interpretation thereof or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties hereto and supersedes all prior agreements and understandings of the parties in connection with it, excepting only the Merger Agreement and any resolutions or letters issued contemporaneously herewith

by the Federal Home Loan Bank Board or the [FSLIC.].

*Id.* at 294.[8]

On July 30, 1982, the FHLBB issued a letter to the Chairman of Perpetual American promising that the FSLIC would "forbear for a period of five years following the consummation of the merger, from exercising its authority under Section 563.13(c) of the Rules and Regulations for the Insurance of Accounts . . . for any failure of Perpetual [American] to meet the net worth requirements of . . . Section 563.13[.]" *Id.* at 277; *see also supra* note 7.

As a result of the merger with Guardian, Perpetual American recorded $41.6 million in supervisory goodwill. *Id.* at 305. In addition, Perpetual American received $10 million from the FSLIC, with "no contingencies or performance requirements imposed [other] than the assumption of Guardian liabilities[.]" Pl. Supp.App. at 142. Perpetual American offered no additional consideration for the approval of the merger with Guardian, other than assumption of Guardian's liabilities. *Id.*

**C. In 1983, Perpetual American Acquired Interstate Federal Savings And Loan Association.**

In September 1983, Perpetual American acquired Interstate Federal Savings and Loan Association ("Interstate"). *See* Pl. Supp.App. at 142. This merger "significantly increased the net worth of Perpetual American" and enabled it to expand its office network in Washington, D.C. *Id.* Perpetual American accounted for this acquisition under the "pooling of interests method." *Id.* Perpetual American's August 17, 1984 Offering Circular stated: "Had [Perpetual American] not consummated this acquisition [of Interstate], [Perpetual American] would have had a net loss of approximately $74,000 in fiscal 1983[.]" *Id.* As a result of this acquisition and the 1980 acquisition of American Federal Savings and Loan Association ("American"), Perpetual American's net

---

8. A similar integration clause was held to bind the federal regulatory agencies to an agreement by a stipulation with the Glendale institution, *i.e.*, "any goodwill . . . shall be determined and amortized in accordance with [Bank Board] Memorandum R–31b." *Winstar II*, 64 F.3d at 1540–41. A "stipulation" can arise in one of two contexts: a contract or an agreement between opposing parties, in a judicial proceeding. *See* Black's Law Dictionary (7th ed.1999) at 1427. In the first context, it is a "material condition or requirement in an agreement; esp., a factual representation that is incorporated into a contract as a term[.]" *Id.*

worth was increased by approximately $49 million, representing the combined net worth of American and Interstate. *Id.*[9]

The following chart summarizes a perspective of Perpetual American's acquisitions during the period 1980–1983:

| Name of Association | Date of Combination | Number of Offices [10] | Total Assets at Date of Combination [In Thousands] | Total Assets of Combined Entities at Date of Combination [In Thousands] |
|---|---|---|---|---|
| American | October 31, 1980 | 7 | $389,225 | $1,443,497 |
| Washington–Lee | June 30, 1982 | 19 | $276,107 [11] | $1,815,006 |
| Guardian | July 31, 1982 | 6 | $148,218 | $1,992,351 |
| Interstate | September 30, 1983 | 15 | $464,642 | $2,628,282 |

Pl. Supp.App. at 142.

**D. In 1984, Perpetual American Issues Stock And Becomes Perpetual Savings And In 1985–1986, Perpetual Savings Issues Additional Stock.**

In 1984, Perpetual American converted from a mutual form of ownership, in which depositors own the thrift, to a federal stock savings bank via a public offering. *Id.* at 137–45 (excerpts from Aug. 17, 1984 Offering Circular). Stock in the new company, Perpetual Savings and Loan Association ("Perpetual Savings"), was sold to over 4,000 public shareholders, including many depositors of Perpetual American, resulting in net proceeds of $43.5 million transferred to Perpetual Savings. *Id.* at 139; *see also* Amend. Compl. at ¶ 11. The offering documents used in the public sale "made clear [Perpetual American's] reliance on the 'supervisory' goodwill and its investment in its subsidiaries as part of its regulatory capital." Amend. Compl. at ¶ 11; *see also* Pl. Supp.App. at 142–43 (identifying $139 million in goodwill as an asset amortized over 40 years).

In 1985, Perpetual Savings sold 4.6 million shares of cumulative convertible preferred stock to the public for $46 million. *See* Pl.

Supp.App. at 146–54. In 1986, Perpetual Savings also publicly sold more than $74 million of subordinated notes, convertible to shares. *Id.* at 155–62. Perpetual Savings' offering materials "emphasized . . . reliance on the 'supervisory' goodwill which arose from its 1982 acquisitions and its investment in its subsidiaries as a significant portion of its reported capital." Amend. Compl. ¶ 12; *see also* Pl. Supp.App. at 152–53, 162; Pl. Reply at 15 ("Had Perpetual [Savings] not been able to count the goodwill as an asset and part of its capital, it would not have met regulatory standards throughout this period and no one would have invested in its stock and notes.").

**E. In 1988, Perpetual Financial Corp. Acquired Perpetual Savings.**

Perpetual Financial Corporation ("Perpetual Financial") was organized in May 1987 as a Delaware corporation specifically to acquire Perpetual Savings. *See* Def.App. at 411–19. On June 29, 1987, Perpetual Financial applied to the FHLBB for approval to acquire Perpetual Savings. *Id.* at 357–419.[12] According to Perpetual Financial's application,

9. Perpetual American's mergers with these two institutions were not "supervisory," but instead used the "pooling" method of accounting, rather than the purchase method. *See* Pl. Supp.App. at 142, 152, 162.

10. "Does not reflect closings and consolidations of branch offices subsequent to acquisition[.]" Pl. Supp.App. at 142.

11. "The total assets of [W & L] and Guardian represent discounted values determined after the application of the purchase method of accounting, excluding the excess of [Perpetual American's] purchase price over the fair market value of the net assets acquired. The total assets of [W & L] and Guardian prior to the application of the purchase method of accounting were $367.5 million and $184.0 million, respectively." Pl. Supp. App. at 142.

12. The merger application states that Perpetual Financial was a wholly-owned subsidiary of Perpetual Associated Services, Inc., a wholly-owned

Perpetual Financial was to be the sole shareholder of an "interim" federal stock savings bank, Perpetual Interim Federal Savings Bank ("Perpetual Interim"), organized solely for the purpose of facilitating the acquisition of Perpetual Savings by Perpetual Financial, with the result that Perpetual Savings would merge with Perpetual Interim and become the "surviving savings bank." *Id.* at 363. At the conclusion of these transactions, the stock of Perpetual Interim was to be converted into the outstanding stock of Perpetual Savings, so that Perpetual Financial would become a holding company and the sole shareholder of Perpetual Savings, and the stockholders of Perpetual Savings would become the stockholders of Perpetual Financial. *Id.*

On August 4, 1988, the FHLBB issued Resolution No. 88–656 approving Perpetual Financial's application to acquire Perpetual Savings. *See* Pl.App. Ex. H at 1. Resolution No. 88–656 required that Perpetual Financial provide an opinion letter from an independent accountant evidencing that the acquisition was recorded in accordance with GAAP. *See* Def.App. at 609, 611. Perpetual Financial's accountant submitted a November 4, 1988 letter, however, stating that Perpetual Financial elected to use the pooling method, rather than the purchase method of accounting, thereby recording no new intangible assets. *Id.* at 62–63, 617–18. Perpetual Financial's acquisition of Perpetual Savings was not conditioned on any accounting treatment regarding supervisory goodwill. *Id.* at 407–08.

On October 6, 1988, Perpetual Financial and the FSLIC entered into a Regulatory Capital Maintenance/Dividend Agreement, approving Perpetual Financial's application to acquire Perpetual Savings, but requiring Perpetual Financial to maintain Perpetual Savings' regulatory capital at a level at or above the Regulatory Capital Requirement set forth in 12 C.F.R. Part 563.13(b). *See* Pl.App. Ex. N at 2; *see also supra* note 7.

The balance of the supervisory goodwill resulting from Perpetual American's acquisitions of W & L and Guardian carried over from Perpetual Savings and subsequently

was recorded on Perpetual Financial's consolidated statements. *See* Pl. Supp.App. at 293–302 ("financial highlights" for Perpetual Savings from 1982–1986); *id.* at 303–18 (Perpetual Financial's Transition Report on Form 10–Q, filed with SEC for period ending December 31, 1989, reflecting $91.9 million in supervisory goodwill).

**F. In 1990, Perpetual Savings Failed To Meet Regulatory Capital Requirements.**

On August 9, 1989, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act, Pub.L. No. 101–73, 103 Stat. 183 (1989) ("FIRREA"), a comprehensive reorganization of federal supervisory authorities that imposed stringent capital requirements on thrift institutions and altered the regulation of goodwill and purchase accounting. On October 31, 1989, Perpetual Savings' regulatory capital was $379.7 million, exceeding the minimum capital requirement by $204.6 million. *See* Def.App. at 427. Pursuant to FIRREA and its implementing regulations, effective December 7, 1989, Perpetual Savings' regulatory capital as of October 31, 1989, was $364.6 million. *Id.* Thereafter, real estate values plummeted in the Washington, D.C. market. *Id.* at 30–31, 34, 38, 107–108.

On May 1, 1990, the Office of Thrift Supervision ("OTS") designated Perpetual Savings a "troubled institution." Pl.App. Ex. P at 1–3. By December 1990, Perpetual Savings also failed to meet its regulatory capital requirements. *See* Def.App. at 436 (excerpt from Perpetual Financial Annual Report detailing capital shortfall as of Dec. 31, 1990). On December 31, 1990, Perpetual Savings' total regulatory capital (*i.e.,* risk-based capital) was $200.7 million, falling below regulatory requirements by $73.8 million. *Id.* Perpetual Savings, however, attributed this shortfall to several factors:

[E]ffective December 31, 1990, the risk-based capital requirement was raised from 6.4% to 7.2%, which resulted in an increase of over $30 million in required capital ... [A]pproximately $20.5 million of [Perpetual

subsidiary of Perpetual Savings. *See* Def.App. at 363.

Savings'] supervisory goodwill at December 31, 1990 could not be included as 'qualifying supervisory goodwill' in determining the amount of core capital. This exclusion was due to regulation which limits the amount of qualifying supervisory goodwill to 1.5% of tangible assets. [Perpetual Savings'] level of tangible assets has been decreasing throughout 1990 as a result of balance sheet downsizing. The combined impact of each of these factors more than offset the reductions in required capital resulting from [Perpetual Savings'] efforts to reduce total assets, and to reduce the risk profile of the assets that remain.

*Id.*

Accordingly, Perpetual Savings applied to the OTS for permission to repurchase $45—$60 million of subordinated convertible debt that could have resulted in an estimated increase in capital from $37.5 million to $54 million. *See* Pl.App. Ex. C at 3. The OTS, however, declined to approve the repurchase proposal because it would have reduced cash available in the event of a bank failure. *Id.* On August 14, 1991, OTS entered into an agreement with Perpetual Savings under which Perpetual Savings agreed to certain operating restrictions in exchange for regulatory forbearance. *See* Pl.App. Ex. Q. Perpetual Savings failed to meet the operating restrictions.

Accordingly, on January 10, 1992, the OTS appointed the Resolution Trust Corporation ("RTC") as receiver for Perpetual Savings. *See* Def.App. 439–40 (OTS Order No. 92–6). By operation of law, the RTC succeeded to all rights of Perpetual Savings. *See* 12 U.S.C. § 1441a(b)(4) [13] and 12 U.S.C. § 1821(d)(2)(A)(i).[14] On that same date, the RTC, as receiver, sold remaining assets of Perpetual Savings to the RTC, in that agency's corporate capacity. *See* Def.App. II at 1–19. On December 31, 1995, the FDIC succeeded to all rights and responsibilities of

the RTC. *See* 12 U.S.C. § 1441a(m). With the "sunset" of the RTC on December 31, 1995, the FSLIC Resolution Fund ("FRF") received the assets and liabilities of the RTC as corporation. *See* 12 U.S.C. § 1441a(m)(2) (transferring the RTC's assets to the FRF); 12 U.S.C. § 1821a(a)(3) (establishing the FRF). By the end of 2002, the Perpetual Savings receivership owed the FRF almost $1 billion in principal and interest. *See* Def. App. at 448.

## PROCEDURAL HISTORY

On August 3, 1995, Perpetual Financial filed a complaint with the United States Court of Federal Claims, that was assigned to the Honorable Lawrence S. Margolis. On September 20, 1995, an order was entered in this case granting a motion by defendant ("the Government") to stay proceedings pending the appellate resolution of liability issues in *Winstar I.*

On July 1, 1996, the United States Supreme Court affirmed the United States Court of Appeals for the Federal Circuit's holding that "the Government had express contractual obligations to permit respondents to use goodwill and capital credits in computing their regulatory capital reserves. When the law as to capital requirements changed, the Government was unable to perform its promises and became liable for breach under ordinary contract principles." *See Winstar III,* 518 U.S. at 840, 116 S.Ct. 2432.

On March 11, 1997, an order was issued by the Honorable James T. Turner that allowed the FDIC to file a complaint in each of the other pending *Winstar*-related cases. *See Winstar I,* Fed.Cl. No. 90–8C (Order filed March 11, 1997). Therefore, in this case, on March 14, 1997, the Federal Deposit Insurance Corporation ("FDIC") filed a complaint as intervenor. On May 14, 1997, Perpetual Financial filed a First Amended Complaint alleging direct and derivative claims for

---

**13.** As a matter of law, the RTC acquired "the same powers and rights to carry out its duties ... as the Federal Deposit Insurance Corporation has under sections 1821, 1822 and 1823 of this title with respect to insured depository institutions." 12 U.S.C. § 1441a(b)(4).

**14.** As a matter of law, the FDIC, as conservator or receiver, succeeded to "all rights, titles, powers and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution[.]" 12 U.S.C. § 1821(d)(2)(A)(i).

breach of implied contract, frustration of purpose, promissory estoppel and claims under the Due Process and Just Compensation Clauses of the Fifth Amendment of the United States Constitution. *See* Amend. Compl. ¶¶ 83–117 and Prayer for Relief. On April 3, 1998, Perpetual Financial filed a "short form" Motion for Summary Judgment on Contract Issues seeking entry of a judgment that a contract existed between Perpetual Financial and the FDIC and/or the FSLIC that was breached by these federal regulators.

On August 28, 1998, an order was issued in *Winstar*, Fed.Cl. No. 90–8C, reassigning this case to the Honorable Loren A. Smith. On October 24, 2002, Judge Smith issued an order granting the Government's Motion to Stay Resolution of the Motion for Partial Summary Judgment Pending Completion of Fact Discovery. On November 19, 2002, the FDIC filed a renewed Motion to Substitute FDIC as Plaintiff for Perpetual Financial, together with an Appendix. On December 19, 2002, the Government filed a Response to FDIC, a Motion to Dismiss FDIC, and a Motion to Dismiss Perpetual Financial's derivative and non-contractual claims, with an Appendix. On January 21, 2003, the FDIC filed a Response, with an Appendix. On January 31, 2003, the Government filed an Amended Response. On February 7, 2003, the Government filed a Reply to FDIC, with an Appendix. On February 11, 2003, Perpetual Financial filed a Response to FDIC and the Government, with an Appendix. On February 19, 2003, the Government filed a Reply to Perpetual Financial. On February 27, 2003, the FDIC filed a Reply to Perpetual Financial, with an Appendix.

On March 20, 2003, this case was reassigned to the Honorable Lawrence J. Block. Fact discovery was completed on June 6, 2003. On July 29, 2003, the Government filed an Opposition to Perpetual Financial's

Motion for Summary Judgment, a Cross–Motion for Summary Judgment on Contract Issues, and a Motion to Dismiss FDIC, together with an Appendix and Proposed Findings of Uncontroverted Fact.

On August 15, 2003, this case was assigned to the undersigned judge. On August 21, 2003, the FDIC filed a Response to the Government's July 29, 2003 Proposed Findings and another Motion to Dismiss. On September 8, 2003, the Government filed a Reply, with an Appendix. On September 29, 2003, Perpetual Financial filed a Response to the Proposed Findings and Response to the Government Cross–Motion for Summary Judgment, and Reply to the Government's Opposition, with an Appendix.

On October 9, 2003, the Government filed a Reply in Support of its Cross–Motion for Summary Judgment, with an Appendix, and a Motion to Strike the August 8, 2003 Affidavit of Ms. Judith E. McCaffrey, an attorney who has represented plaintiff in this case and also served as outside counsel to Perpetual American during the acquisition of W & L.[15] On October 23, 2003, Perpetual Financial filed a Response to the Government's Motion to Strike. On November 3, 2003, the Government replied.

On November 12, 2003, an oral argument was held before the undersigned judge on all pending dispositive motions. During that argument, the court requested that the parties address recent relevant authority of the United States Court of Appeals for the Federal Circuit in post-hearing briefs. On November 14, 2003, the Government filed a Supplemental Brief. On November 25, 2003, Perpetual Financial also filed a Supplemental Brief. On December 8, 2003, the court granted leave for the Government to file a Response to Perpetual Financial's Supple-

---

**15.** Other declarations and affidavits were submitted by plaintiff in this proceeding: Mr. Lee Beard, Treasurer of Perpetual American and Perpetual Savings, Mr. Gilbert E. Delorme, Jr., General Counsel, and Mr. Joseph A. Cicero, Chief Financial Officer, each submitted declarations (dated March 31, 1998, April 2, 1998, and April 1, 1998, respectively) concerning 1982 negotiations between Perpetual American and the relevant federal regulatory agencies regarding the proposed mergers with W & L and Guardian. *See* Pl.App. Ex. A–C. On August 7, 2003, an updated affidavit was signed by Mr. DeLorme. *See* Pl. Supp.App. at 323–27. On September 3, 2003, Mr. Ross Towne, who held various positions with Perpetual American and Perpetual Savings, including Controller, CFO, President and Director, also signed an affidavit. *See* Pl. Supp.App. at 341–48.

mental Brief and for Perpetual Financial to file a Reply on December 18, 2003.

On January 15, 2004, Perpetual Financial filed a Motion to Postpone Expert Discovery, pending resolution of dispositive motions. On January 28, 2004, the Government filed an Opposition. On February 4, 2004, Perpetual Financial filed a Reply. On February 19, 2004, the court granted Perpetual Financial's Motion to Postpone Discovery, pending issuance of this Memorandum Opinion on pending dispositive motions.

## A. Issues Raised By The Parties Requesting Entry Of Summary Judgment.

### 1. Primary Arguments Of Perpetual Financial.

Perpetual Financial's First Amended Complaint alleges that Perpetual American's 1982 transactions "had their genesis in the government's desire to find an alternative to the liquidation, at great cost to the United States, of [Guardian and W & L]. To avoid the millions of dollars of liability to depositors that FSLIC would have been required to pay upon the failure of those institutions, the government *induced* the mergers of the institutions with [Perpetual American].... FSLIC and FHLBB *induced* the Bank, the acquiring institution, into merging with [W & L and Guardian] by aggressive application of the 'purchase method' of accounting for the mergers. Under these accounting principles, any [goodwill] could be amortized over a long period of time—thirty-five to forty years. The government allowed this goodwill to be recognized as capital for the purpose of satisfying the FHLBB's minimum capital requirements. These *inducements* were absolutely critical to the acquirer institution's decision to merge with insolvent or failing thrifts." Amend. Compl. at ¶ 2 (emphasis added).

Perpetual Financial's First Amended Complaint also alleges that "[Perpetual American] would not have acquired Guardian had it not also been permitted to acquire Washington & Lee. Further, [Perpetual American] would not have acquired Washington & Lee and Guardian had it not been permitted to utilize the purchase money method of accounting as the acquisition, without utilizing

such accounting method, would have rendered [Perpetual American] either insolvent or left it in a distressed financial condition." Amend. Compl. at ¶ 14; *see also* Pl. Reply at 13 (citing Pl. Supp.App. at 136) (estimating that the W & L and Guardian mergers resulted in $138 million in supervisory goodwill).

Perpetual Financial claims that when FIR-REA was enacted, Perpetual Savings lost approximately $100 million in regulatory capital, causing it to fall out of regulatory compliance, and requiring OTS to treat it as a troubled institution. *See* Pl. Mot. Sum. J. at 4–5. This loss allegedly was caused by "the OTS and the RTC [which] actively undermined and frustrated [Perpetual Savings'] attempts to address the capital shortfall created by its loss of $100 million in regulatory capital." *Id.* at 6. Perpetual Financial asserts that Perpetual Savings' asset base declined from $6.171 billion on October 31, 1989 to $3.416 billion by September 30, 1991, before the remaining assets were liquidated. *Id.* at 5–6. Therefore, Perpetual Financial argues that the Government's actions caused Perpetual Savings to fail and should result in an award of "damages [that] will flow directly to the former [Perpetual Savings'] shareholders who are now shareholders of [Perpetual Financial]." *See* Pl. Reply at 48.

### 2. Primary Arguments Of The Government.

The Government counters that Perpetual Financial had no contractual relationship with the FHLBB or the FSLIC, either as a direct party, third-party beneficiary, or through an assignment or novation. *See* Def. Mot. Sum. J. at 1. To the extent that such claims are asserted derivatively by Perpetual Financial on behalf of Perpetual Savings (and its predecessors), the Government also argues that it had no contractual relationship with Perpetual Savings. *Id.* at 1–2. Instead, the Government argues that Perpetual Saving's assets declined because of a recession affecting the Washington, D.C. area and Perpetual Savings' expansion into risky assets. *Id.* at 8–9 (citing Def.App. at 30–31, 34 (Dep. of John H. Morton)). Accordingly, the Government concludes that even if Perpetual

Savings had been allowed to count unamortized goodwill, it still would have failed to meet FIRREA's requirements. *See* Def. Mot. Sum. J. at 9.

## DISCUSSION

### A. Jurisdiction.

The United States Court of Federal Claims is authorized, under the Tucker Act, 28 U.S.C. § 1491(a)(1), to render judgment and money damages on any claim against the United States based on the United States Constitution, an Act of Congress, a regulation of an executive department, or an express or implied contract with the United States. *See United States v. Testan,* 424 U.S. 392, 397–98, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). The United States Supreme Court has clarified that the Tucker Act does not create any substantive right for monetary damages. *See United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). Instead, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages for the court to have jurisdiction. *See Khan v. United States,* 201 F.3d 1375, 1377 (Fed.Cir.2000).

In this case, the Amended Complaint sets forth two viable claims. Count I properly alleges a claim for breach of contract. *See* Amend. Compl. at ¶¶ 83–88. In addition, Count VI properly alleges a breach of implied-in-fact contract between Perpetual Financial and Perpetual Savings and the FSLIC, FHLBB and their successors that has been "substantially breached." Amend. Compl. at ¶¶ 109–113; *see also Maher v. United States,* 314 F.3d 600, 603 n. 1 (Fed. Cir.2002) (plaintiff may establish privity through an implied-in-fact contract with the United States). The remaining counts, however, must be dismissed on jurisdictional grounds.

Count II states a claim for frustration of purpose; a defense for nonperformance; not a separate cause of action. *See* Amend. Compl. at ¶¶ 89–94. Accordingly, as a matter of law, Count II must be dismissed. *See*

*Plywood Corp. v. United States,* 227 Ct.Cl. 415, 651 F.2d 723, 728 (.1981) ("Under the frustration defense, the promissor's performance is excused because changed conditions have rendered the performance bargained from the promisee worthless, not because the promissor's performance has become different or impracticable."); *see also Far West Fed. Bank, S.B. v. OTS,* 119 F.3d 1358, 1364 (9th Cir.1997) ("Frustration of purpose is an excuse for non-performance, not a cause of action.").

Count III states a claim that alleges FIRREA and the OTS' capital regulations restricting the inclusion of Perpetual Savings' supervisory goodwill and "its investment in its subsidiaries as capital for purposes of satisfying minimum capital requirements ... effects a taking of Perpetual's property[.]" Amend. Compl. at ¶ 96; *see id.* at ¶¶ 95–97. As the United States Court of Appeals for the Federal Circuit held in *Castle v. United States,* 301 F.3d at 1342, however, "[t]he breach-of-contract based takings claim fails because even assuming it was breached, the alleged contract did not create a reasonable expectation that the government would cease regulating the thrift industry, or any particular thrift therein." Therefore, Count III must be dismissed.

[1] Count IV sets forth an almost identical allegation as Count III, but recites the claim as one for a violation of the Due Process Clause of the Fifth Amendment to the United States Constitution. *See* Amend. Compl. at ¶¶ 98–99. The United States Court of Federal Claims, however, does not have jurisdiction to provide relief for constitutional claims that do not entail a money-mandating remedy. *See Crocker v. United States,* 125 F.3d 1475, 1476 (Fed.Cir.1997). Therefore, Count IV must be dismissed.

■ Count V states a claim for breach of contract based on promissory estoppel. *See* Amend. Compl. ¶¶ 100–08. The court, however, does not have jurisdiction over claims of promissory estoppel. *See LaMirage, Inc. v. United States,* 44 Fed.Cl. 192, 200 (1999) ("this court is without jurisdiction to entertain claims arising from a contract, based on

the theory of promissory estoppel[.]"). Accordingly, Count V must be dismissed.

Count VII states a claim that Perpetual Financial and Perpetual Savings' "contract rights ...constitute property within the meaning of the Fifth Amendment[.]" Amend. Compl. at ¶ 116. As a matter of law, our appellate court has held that seizure of a financial institution for failure to meet regulatory capital requirements, however, does not constitute a taking. See *Branch v. United States,* 69 F.3d 1571, 1575 (Fed.Cir. 1995). Count VII also alleges that the regulatory capital requirements of FIRREA "effect[ed] a deprivation of [Perpetual Financial's] property without due process of law[.]" Amend. Compl. at ¶ 117. For the same reasons as Counts III and IV, Count VII also must be dismissed.

## B. The Requirements of Article III Standing Have Not Been Met In This Case.

### 1. Standard Of Review.

Federal courts "typically should ... decide standing questions at the outset of a case. That order of decision (first jurisdiction then the merits) helps better to restrict the use of the federal courts to those adversarial disputes that Article III defines as the federal judiciary's business." *Steel Co.,* 523 U.S. at 111, 118 S.Ct. 1003 (Breyer, J. concurring). As the party invoking federal jurisdiction, the plaintiff has the burden of proof and persuasion to satisfy the constitutional requirements for Article III standing. *See FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990).

At the summary judgment stage, the United States Supreme Court specifically has instructed the lower courts that a plaintiff must:

> "set forth" by affidavit or other evidence "specific facts," Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true ... When the suit is one challenging the legality of government action ... the nature and extent of facts must be averred (at the summary judgment stage) ... in order to establish standing depends considerably on

whether the plaintiff is ... an object of the action ... at issue. If [so], there is ordinarily little question that the action ... has caused him injury, and that a judgment ... requiring action will redress it. When, however, as in this case, a plaintiffs' asserted injury arises from the government's allegedly unlawful regulation ... of *someone else,* much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated ... third party to the government action ... Thus, when the plaintiff is not ... the object of the government action ... standing is not precluded, but it is ordinarily "substantially more difficult" to establish.

*Defenders of Wildlife,* 504 U.S. at 561–62, 112 S.Ct. 2130 (citations omitted).

### 2. Perpetual Financial Did Not Meet Its Burden To Establish Standing.

### a. Perpetual Financial Did Not Establish Injury In Fact.

■ To establish injury in fact, plaintiff must have suffered: "an invasion of a legally protected interest, which is (a) concrete and particularized *and* (b) 'actual or imminent, not conjectural or hypothetical.'" *Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130 (emphasis added). Perpetual Financial, a holding company and the sole shareholder of Perpetual Savings, has two potential "legally protected interests" in this case that allegedly were "invaded" or adversely affected by the enactment and implementation of FIRREA.

■ In this case, on October 6, 1988, Perpetual Financial and FSLIC entered into a Regulatory Capital Maintenance Agreement ("RCM Agreement") that required Perpetual Financial to maintain certain regulatory capital levels as a condition for approval to purchase Perpetual Savings. *See* Pl.App. Ex. N. In addition, Perpetual Financial was limited in the circumstances under which dividends could be issued. *Id.* The RCM Agreement was effective, however, only "*as long* as the Acquiror [Perpetual Financial] controls the institution [Perpetual Savings]." *Id.* at 2 (II Obligations of Acquiror) (emphasis added); *see also id.* at 6 (VII Termination of Agree-

ment) ("the Acquiror's obligations ... shall terminate ... upon a finding of the FSLIC that the Acquiror's control of the Institution has been terminated[.]"). Perpetual Financial, however, lost control of the operations of Perpetual Savings on January 10, 1992, when the OTS appointed the RTC as a receiver. *See* Def.App. 439–40 (OTS Order No. 92–6). Therefore, on that date, Perpetual Financial no longer had a "legally protected interest" in the RCM Agreement. Moreover, since the RCM Agreement specifically defined "Regulatory Capital Deficiency," as defined in 12 C.F.R. Part 563.13 "or any successor regulation," Perpetual American was required to comply with current regulatory capital requirements, as well as future requirements, even if they were more stringent. *See* Pl.App. Ex. N at 2.

■ The second legally protected interest that Perpetual Financial has, as a shareholder of Perpetual Savings, arises in the event there is any excess recovery. The United States Court of Appeals for the Federal Circuit has recognized that a shareholder may have "cognizable property interest in eventual liquidation surplus arising under depositor preference statute whereby the receiver is directed to transfer any remaining funds to the depository institution's shareholders." *Bailey,* 341 F.3d at 1347. But, where the receivership deficit exceeds the estimated damages, the interest is neither "concrete" nor "particularized." *See Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130. That is the situation here. Perpetual Financial claims at least $460 million in potential damages. *See* Amend. Compl. at 35. The FDIC's receivership Report for Perpetual Financial, dated May 30, 2002, however, estimated that the amount owed to FDIC, apart from other creditors at equal priority,[16] was more than $900 million. *See* FDIC Mot. at 9, Ex. 10. Subordinated debt, at a lower priority, totals about $64 million. *Id.* With other creditors' claims, the receivership had negative net equity of $971,510,002. *Id.* Therefore, a recovery in excess of the $970 million must be achieved before Perpetual Financial and its shareholders even have a potential claim for recovery.

Nevertheless, Perpetual Financial argues that it should be able to pursue its damage claims simply because they could total more than $970 million. *See* Pl. Resp. to FDIC/ Def. Mot. at 15–17. Perpetual Financial

16. Under the receivership priority system, all recovery on a savings and loan association's claims must be paid to the thrift estate and all creditor claims must be fully satisfied before any shareholder may receive any amount from the estate. *See* 12 U.S.C. § 1821(g) (2000) (upon payment of insured deposits of liquidated institution, FDIC is subrogated to rights of the depositor against the institution); 12 U.S.C. § 1821(d)(11) (1988 ed. Supp. II (1991)) (a previous version of the subrogation provision the parties agree governs distribution in this case, providing for "subrogated claims; claims of uninsured depositors and other creditors" (subparagraph A), and "distribution to shareholders of amounts remaining after payment of all other claims and expenses" (subparagraph B)).

According to the FDIC, all receivership creditors at the same priority level must share in any of Perpetual Savings' recoveries on a *pro rata* basis. *See* FDIC Opp. at 15–16 (discussing *American Heritage Bancorp. v. United States,* 53 Fed. Cl. 723 (2002), holding that 12 C.F.R. § 360.3 permits a *pro rata* distribution under 12 U.S.C. § 1821(d)(11)). In this case, the FDIC has advised the court that, in addition to the subrogated claim of the FRF, uninsured depositors have claims against Perpetual Savings' receiver of more than $1.7 million. *See* FDIC Opp. at 15.

The Government argues that, contrary to FDIC's argument, § 1821(d)(11) provides that the receivership must pay to the FRF the entire amount the Government paid to the insured depositors, before any payments to uninsured depositors and other creditors. *See* Def. Reply to FDIC at 8–12 (discussing *Glass v. United States,* 258 F.3d 1349, 1355–56 (Fed.Cir.2001)). Regardless of the dispute concerning priority between creditors, it is clear that the claims of the FSLIC Resolution Fund and additional creditors are entitled to priority over other claims, including those of Perpetual Savings' shareholders. *See Landmark Land Co., Inc. v. United States,* 256 F.3d 1365, 1381 (Fed.Cir.2001) ("under the statutory scheme of priority for thrift creditors, the FDIC is obligated to completely satisfy the claim of the government, specifically that of the FSLIC Resolution Fund ('FRF') ... before distributing any proceeds to ... other creditors."); *Glass,* 258 F.3d at 1355–56 ("While any net recovery by the FDIC would be distributed to creditors under the statutory scheme applicable to the Security receivership, in this case FRF–RTC has priority over all other creditors under this statutory scheme"); *see also Plaintiffs in All Winstar–Related Cases at the Court v. United States,* 44 Fed. Cl. 3, 5–6 (1999) (holding claims of failed thrifts must be distributed under statutory order of priorities).

further asserts that pursuit of a potential recovery is justified because "[n]either the FDIC or the United States cite any support for the assertion that any recovery will be less than $1 billion.... PFC should be permitted to make its claim and prove its damages.... PFC was an institution with almost $7 billion dollars of assets prior to the breach of the contract. After that breach and after the RTC receivership, it was a shell with no assets and significant liabilities. It is not at all inconceivable that a breach of contract which caused the wipe out of $7 billion of assets could result in 'damages' of $1 billion[.]" *Id.* at 16–17. All of this may be so, but the burden on Perpetual Financial is to evidence "specific facts," establishing that a recovery of more than $970 million is "concrete" and "particularized." *See Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130. Neither the Amended Complaint, declarations, affidavits, nor any other document proffered by Perpetual Financial remotely comes close to meeting this burden. Accordingly, the court has no option but to hold that Perpetual Financial has failed to establish injury in fact.

### b. Perpetual Financial Did Not Establish A Causal Connection Between Its Alleged Injury And The Enactment And Implementation Of FIRREA.

Since the standing analysis in *Defenders of Wildlife,* reaffirmed by *McConnell,* requires satisfaction of each of the three elements of standing, the court's obligation to evaluate Perpetual Financial's standing is now concluded. Assuming *arguendo* that the court is mistaken about injury in fact, however, the court has determined that Perpetual Financial also did not establish a causal connection between its alleged injury and the enactment and implementation of FIRREA. Therefore, the court briefly will review causation, but as an element of standing, not on the merits as the parties mistakenly have done.

The second constitutional test of the standing inquiry focuses on whether the alleged injury is "fairly ... trace[able] to the challenged action of the defendant[.]" *Simon,* 426 U.S. at 41–42, 96 S.Ct. 1917; *see also*

*Anderson,* 344 F.3d at 1351 (holding a plaintiff seeking to invoke the jurisdiction of the United States Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491(a)(1) "must be in privity of a contract with the United States.").

### i. Perpetual Financial Had No Direct Legal Relationship With Perpetual American's 1982 Mergers With W & L Or Guardian.

Perpetual Financial had no legal existence until May 1987 when it was established to acquire Perpetual Savings. *See* Def.App. at 411–19. Therefore, *ipso facto,* Perpetual Financial had no direct legal relationship with Perpetual American when it merged with W & L and Guardian in 1982, nor does the Amended Complaint allege otherwise. Nor was Perpetual Financial a signatory or party to the June 29, 1982 FHLBB Resolution No. 82–440, the July 30, 1982 FHLBB Resolution No. 82–515, nor Perpetual American's July 30, 1982 Assistance Agreement with FSLIC. Therefore, since Perpetual Financial was not a party to any alleged agreements between Perpetual Savings (and its predecessors) and the FHLBB or FSLIC regarding the 1982 mergers with W & L and Guardian, Perpetual Financial cannot establish the requisite causal connection to establish standing. *See Landmark Land,* 256 F.3d at 1380 (quoting *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617 (1937)) ("In order for a plaintiff's claim to satisfy the case-or-controversy requirement, resolution of that claim must affect 'the legal relations of parties having adverse legal interests.'"); *see also Glass v. United States,* 258 F.3d 1349, 1355 (Fed.Cir. 2001) ("[B]ecause the shareholders did not stand to directly benefit under the contract, they are at most incidental beneficiaries of the contract with no rights to enforce [it] against the United States.").

### ii. Perpetual Financial Was Not A Third–Party Beneficiary To Perpetual American's 1982 Mergers With W & L And/Or Guardian.

Our appellate court has instructed the United States Court of Federal Claims that

to establish standing as a third-party beneficiary:

> a party must demonstrate the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly. Third party beneficiary status is an "exceptional privilege" and, to avail oneself of this exceptional privilege, a party must "at least show that [the contract] was intended for his *direct* benefit." *German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230, 33 S.Ct. 32, 57 L.Ed. 195 (1912) (emphasis added); see also RESTATEMENT (SECOND) OF CONTRACTS § 302, Illustration 2 (distinguishing between a direct beneficiary and an indirect beneficiary who is, at most, an incidental beneficiary with no rights to enforce the contract.).

*Glass*, 258 F.3d at 1354; *see also Castle*, 301 F.3d at 1338 (quoting *Glass*, 258 F.3d at 1353–54) (rejecting shareholders claims of standing where the contract does not specifically express the intent of the promissor to benefit the shareholder "personally, independently of his or her status as a shareholder.").

The FSLIC Assistance Agreement specifically provides that no persons, other than FSLIC and Perpetual American, were intended to have any benefits, rights, or remedies thereunder. *See* Def.App. at 295–96. The Amended Complaint does not allege nor do the declarations and affidavits proffered by Perpetual Financial demonstrate that the FHLBB or FSLIC intended to benefit Perpetual Financial directly as a third-party beneficiary. To the extent that these federal regulatory agencies may have intended to benefit Perpetual Savings (or its predecessors),[17] as a matter of law, any such claims now may only be pursued by the FRF–RTC.[18] Therefore, as a matter of law, Perpetual Financial was not a third party beneficiary to Perpetual American's 1982 mergers with W & L and/or Guardian.

### iii. Perpetual Financial Does Not Have Derivative Standing

In 1999, the United States Court of Appeals for the Federal Circuit implicitly overruled *Whited v. United States*, 230 Ct.Cl. 963, 1982 WL 1408 (1982), by holding that the United States Court of Federal Claims has limited jurisdiction over shareholder derivative actions: "standing to sue is *only* found here because of the FDIC's conflict of interest by which it is both alleged to have caused the breach and controls the depository institution." *First Hartford Corp. Pension & Trust v. United States*, 194 F.3d 1279, 1283 (Fed.Cir.1999) (emphasis added); *see also id.* at 1295 ("[O]ur holding is *limited* to the situation here in which a government contractor with a putative claim of breach by a federal agency is operated by that very same federal agency, as is the case in the receivership context. We neither infer nor express an opinion on the standing of derivative

17. Plaintiff's Amended Complaint alleges that shareholders of Perpetual Financial and Perpetual Savings (including predecessor Perpetual American) purchased approximately $160 million in securities offered by those institutions, and that the proceeds were placed in Perpetual Savings' capital account, in reliance on the "supervisory goodwill" agreements resulting from the W & L and Guardian mergers, which allowed the goodwill to "be treated as an asset includable in the capital of [Perpetual Savings] and amortized on a straight line basis over a period not to exceed up to 40 years." Amend. Compl. at ¶ 84. This capital was raised through sales to the public through offering circulars approved by FHLBB or SEC, and each circular included financial statements that demonstrated more than $100 million of goodwill amortized as assets. *See* Pl. Reply at 45–47. Therefore, Perpetual Financial concludes that the FHLBB and SEC regulatory approvals regarding these transactions in effect formed contracts with Perpetual Savings that recognized the shareholders as third-party beneficiaries, and that these rights transferred to Perpetual Financial upon its acquisition of Perpetual Savings. *Id.*

18. *See* Fact Section at F, *supra*, detailing the statutory transfer of rights from Perpetual Savings to FDIC. In addition, any claim Perpetual Financial may have against RTC as a result of the transfer of Perpetual Savings' claims to the United States may only be brought in a United States District Court. *See Caguas Cent. Fed. Sav. Bank v. United States*, 215 F.3d 1304, 1310 (Fed. Cir.2000), *cert. denied*, 531 U.S. 1070, 121 S.Ct. 759, 148 L.Ed.2d 661 (2001) ("If the [FDIC] has been derelict in the performance of its duties ... the proper remedy would have been a suit against the [FDIC], not one against the United States.").

plaintiffs in other circumstances.") (emphasis added).

In this case, the FDIC, as a successor to the rights of Perpetual Savings, actively has asserted claims against the Government since November 19, 1992. Therefore, the undersigned judge ascertains no reason for the court to make any exception to traditional standing rules, particularly since the FDIC diligently has pursued whatever claims Perpetual Savings may have in this case.

The Federal Circuit also has afforded standing to a shareholder of a failed savings and loan association attempting to pursue a takings claim under the Fifth Amendment. *See California Hous. Sec., Inc. v. United States*, 959 F.2d 955, 957 n. 2 (Fed.Cir.1992). In allowing standing in this specific context, the Federal Circuit cautioned that it read the complaint: "as filed by a sole shareholder on behalf of a corporation alleging that compensation to the corporation will result in a surplus in which the shareholder possesses a direct interest pursuant to 12 U.S.C. § 1821(d)(11)(B) ... [without deciding] whether the Claims Court is authorized to entertain a shareholder derivative suit[.]" *Id.* at 957 n. 2.[19] In this case, Perpetual Financial has not alleged in the Amended Complaint nor proffered in any of Perpetual Financial's declarations, affidavits, or documents that a surplus recovery in excess of $970 million is even a remote possibility.

In *Branch v. United States*, 69 F.3d 1571 (Fed.Cir.1995), a trustee in bankruptcy was granted standing to pursue a Fifth Amendment takings claim because "the complaint can be construed as an action by the trustee ... to recover assets for [the failed] corporation, the court of Federal Claims had jurisdiction over the action regardless of whether the complaint could properly have exercised jurisdiction on a shareholder derivative theory." *Id.* at 1575. Again, neither Perpetual

Financial's Amended Complaint nor any declaration, affidavit, or document proffered demonstrates that there are any surplus assets that reasonably may be expected to be recovered in this case. Under these circumstances, the court must decline to abandon traditional principles of standing to allow Perpetual Financial, an entity with only an incidental, contingent, and remote interest, to stand "in the shoes" of the FRF, the real party at interest.[20]

### iv. There Was No Mutuality Of Intent Between The FHLBB, The FSLIC, And Perpetual Financial Regarding The Amortization Of Supervisory Goodwill Arising From The 1988 Acquisition Of Perpetual Savings.

■ Perpetual Financial's Amended Complaint alleges that the approval of the June 17, 1987 holding company application to acquire Perpetual Savings created a contract between Perpetual Financial and the FHLBB regarding the treatment of supervisory goodwill that had not been fully amortized from Perpetual Savings' 1982 mergers with W & L and Guardian. *See* Amend. Compl. at ¶¶ 65–67; *see also* Pl. Supp.App. at 174, 221–29 (excerpts in Perpetual Financial's Holding Company Application and Business Plan). In support, Perpetual Financial cites to references to "goodwill" in a variety of documents as evidence that the relevant federal regulatory authorities agreed to enter into a contractual relationship regarding the treatment of supervisory goodwill. *See, e.g.,* Pl. Supp.App. at 282–302 ("financial highlights" for Perpetual Financial from 1982–1986); *id.* at 303–18 (Perpetual Financial's Quarterly Report on Form 10-Q, filed with SEC for period ending December 31, 1989, showing goodwill figure of $91.9 million); Pl. Supp.App. at 185–238, 241, 262 (financial statements identifying $116 million in good-

---

19. On the substantive merits, however, the Federal Circuit has held that the actions of the RTC as a conservator and receiver "cannot constitute a physical fifth amendment taking because neither [the savings and loan] nor [its sole shareholder] could have developed a historically rooted expectation of compensation for such a seizure." *California Hous. Sec., Inc.,* 959 F.2d at 958.

20. In 2002, the United States Court of Federal Claims added Rule 23.1 solely to reflect the United States Court of Appeals for the Federal Circuit's recent recognition of the limited circumstances under which a plaintiff may have standing to initiate a derivative action in the United States Court of Federal Claims (*see* RCFC 23.1 and Rules Committee Note).

will carried by Perpetual Savings, to be carried by Perpetual Financial); McCaffrey Aff. at ¶¶ 25–26 ("discussions of the goodwill" were held leading up to its approval); Towne Aff. at ¶¶ 14–15. In addition, Perpetual Financial argues that "the holding company would not have been organized unless its right and the right of [Perpetual Savings] to carry the goodwill forward was affirmed." Pl. P.H. Br. at 3. Perhaps not, but the regulatory documents do not evidence that either the FHLBB or the FSLIC assumed such an obligation in this case.

In the August 4, 1998 approval of the holding company application, the FHLBB stated only that:

No later than thirty days from the date of consummation of the acquisition, PFC shall furnish an opinion from its independent auditor, satisfactory to the Supervisory Agent, which (a) indicates that the transaction was consummated in accordance with generally accepted accounting principles; (b) specifically describes, as of the effective date of the acquisition, any intangible assets, including goodwill, and discount of assets arising from the acquisition to be recorded; and (c) substantiates the reasonableness of amounts attributed to intangible assets, including goodwill, and the discount of assets and the related amortization periods and methods.

Pl. Supp.App. at 68.

In fact, in a November 4, 1988 letter, Perpetual Financial's accountant indicated that the pooling method, rather than the purchase method, would be used in the acquisition of Perpetual Savings by Perpetual Financial, recording no new intangible assets. *See* Def.App. at 62–63 (deposition of Joseph A. Cicero, Perpetual Financial CEO), *id.* at 617–18 (letter from Ernst & Whinney to Joseph A. Cicero).

Nevertheless, Perpetual Financial argues that "[i]n the most basic contract terms an offer was made by PFC in its application when it asked, among other things, permission to carry the goodwill as an asset on PFC's balance sheet. The FHLBB accepted that offer when it approved the [holding company] Application, including the carrying of goodwill." Pl. Reply at 18. No declarations, affidavits, or documents evidence the existence of such an agreement. In the absence of mutuality of intent, the FHLBB's approval of Perpetual Financial's holding company application amounted to no more than a routine exercise of day-to-day regulatory responsibility.

Likewise, the October 6, 1988 RCM Agreement between FSLIC and Perpetual Financial required that Perpetual Financial maintain regulatory capital in accordance with then-existing or future regulations:

All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's obligations under this Agreement.

Def.App. at 624. The United States Court of Appeals for the Eleventh Circuit has held, however, that such language does not evidence mutuality of intent by the federal regulators to afford special treatment for supervisory goodwill and therefore no breach occurred as a result of the enactment and implementation of FIRREA. *See Guaranty Fin. Servs., Inc. v. Ryan,* 928 F.2d 994, 999 (11th Cir.1991) (holding no contract was breached where Regulatory Capital Maintenance Agreement referred to current regulation and successor regulations); *see also Winstar III,* 518 U.S. at 869 n. 15, 116 S.Ct. 2432 (noting *Guaranty* holding); RESTATEMENT § 50(1) (as a prerequisite for contract formation there must be acceptance, *i.e.,* "a 'manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer.'"). The court concurs with that analysis.

v. **No Assignment, Transfer Of Rights Or Novation Occurred Between Perpetual Financial And Perpetual Savings.**

Under the July 30, 1982 FSLIC Assistance Agreement, Perpetual American agreed to obtain the written consent of FSLIC before it could assign or transfer any rights to another party. *See* Def.App. at 295. When Perpetual Financial acquired Perpetual Sav-

ings in 1988 it did so without FSLIC approval. Therefore, in fact, there was no assignment or transfer of rights.

Of course, novation may occur only when there is a prior valid obligation, the agreement of all parties to a new valid contract, and the extinguishment of the old contract. *See Morowitz v. United States*, 15 Cl.Ct. 621, 633–34 (1988). Nothing in the FHLBB Resolution No. 88–656, however, refers to any previous contract or the acceptance of a new contract regarding Perpetual Financial. Therefore, the court has determined in this case that there is no assignment, transfer of rights, or novation between Perpetual Financial and Perpetual Savings.

### 3. The FDIC Also Does Not Have Standing In This Case.

 In addition, there is considerable dispute in this case as to the status of the FDIC as plaintiff-intervenor. The FDIC operates, like the RTC, in two distinct capacities: in its corporate form as insurer of deposits and as the receiver of failed institutions. *See* 12 U.S.C. § 1821a. When acting in its corporate capacity, the FDIC is an agency of the United States. *See Statesman Sav. Holding Corp. v. United States*, 41 Fed.Cl. 1, 13 (1998). When acting in its receivership capacity, the FDIC is not an agency of the United States; *see also O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) ("the FDIC is not the United States").

In this case, the FDIC seeks to intervene in its capacity as successor to the rights of Perpetual Savings and/or in its capacity as manager of the FSLIC Resolution Fund. *See* FDIC Compl. at 1. The Government argues that, as manager of the FRF, the FDIC can only act in its corporate capacity, as set forth in 12 U.S.C. § 1821a(a)(1) (providing that the FRF "shall be managed by the Corporation," not the "Corporation as receiver"). *See* Def. Mot. to Dismiss at 5. In addition, the Government asserts that the FRF is an instrumentality of the United States, having received the assets of FSLIC in its corporate capacity and those of the RTC in its corporate capacity. *Id.* at 6. Therefore, according to the Government, since the RTC, as receiver, sold

Perpetual Savings' claims to the RTC, as a corporation, those claims cannot be now asserted by the FDIC, as receiver. *Id.* at 7; *see also* Def. Reply to FDIC at 3. Thus, the Government argues that the FDIC, as an agency of the United States, cannot assert a claim against the federal government, and should be dismissed from this case for presenting a non-justiciable intra-governmental controversy. *See* Def. Reply to FDIC at 12.

The FDIC responds that there is no conceivable theory under which Perpetual Financial could recover potential damages in excess of $970 million, therefore, Perpetual Financial's Amended Complaint should be dismissed and FDIC should be substituted a plaintiff. Then, the FDIC states it would dismiss the case in its entirety, since no surplus is likely, and the case is not cost-effective to pursue. *See* FDIC Reply at 3 ("The FDIC has filed this renewed motion to substitute or, in the alternative, to dismiss because it has become clear that prosecution of this case is unlikely to be cost effective, and because—as a matter of law—the FDIC cannot properly exit this case so long as the Shareholder Plaintiff Holding Company continues to pursue in this Court what is in fact a derivative lawsuit. The FDIC asks the Court to now end, or allow the FDIC to end, this case.").

In *Bailey*, 341 F.3d at 1346, the United States Court of Appeals for the Federal Circuit held that where the maximum potential award was exceeded by the FRF's subrogated claims, a nonjusticiable intra-governmental dispute exists because any damage awarded from the Government to the FDIC would flow to the FRF, "from one government coffer to another." *Id.* at 1346. Here, the maximum potential return appears to be well below the $970 million in estimated subrogated claims. Accordingly, the FDIC's claim also cannot satisfy the Article III "case or controversy" requirement and the FDIC's complaint is dismissed for lack of standing.

### CONCLUSION

For the foregoing reasons, Perpetual Financial's Amended Complaint and the plaintiff-intervenor FDIC's Complaint are dismissed for lack of standing. Accordingly,

Perpetual Financial's April 3, 1998 Motion for Summary Judgment on Contract Issues, the Government's July 29, 2003 Cross–Motion for Summary Judgment on Contract Issues, and all other outstanding motions hereby are dismissed as moot.

**IT IS SO ORDERED.**